Syllabus.

LOUISA M. BOONE *et al.*

*v.*

ROBERT D. CLARK *et al.*

*Filed at Ottawa June 17, 1889.*

1. MARSHALING SECURITIES—*where one creditor has a lien upon two funds, and another upon only one of them.* Where there are two creditors standing in equal equity, one of whom has security on two funds, and the other only upon one of them, in equity the former will be required to proceed primarily against the fund upon which the latter has no claim.

2. So a creditor having a judgment lien upon several parcels of property, part of which has been taken in satisfaction of a junior judgment, or purchased *bona fide* from the judgment debtor, leaving a portion free from junior incumbrance or unsold, the prior judgment creditor must first resort to the latter fund for satisfaction.

3. SAME—*the rule limited to creditors of a common debtor.* But this principle does not apply when a creditor has a lien upon two funds belonging to two separate debtors, and a creditor of one of the debtors has a lien upon one of the funds. Creditors of a common debtor alone can invoke this right, and it has no application as between creditor and debtor. Nor will the rule be applied to the injury of the prior creditor.

4. SAME—*successive mortgages, or subsequent mortgage and sale—inverse order of alienation.* In case of successive mortgages, or a mortgage and a subsequent sale on execution, or otherwise, of a portion of the mortgaged premises, the subsequent mortgagee or purchaser may insist that the portion of the estate retained by the mortgagor shall first be subject to the mortgage debt, and that the interest of subsequent mortgagees or purchasers shall be liable therefor in the inverse order of alienation.

5. So where a part of the mortgagor's equity of redemption has passed from him by sale under execution, the mortgagee's right of foreclosure will be limited to such amount as may equitably be enforced against such parcel, though the mortgagor may be liable for a larger sum.

6. The equitable rule of marshaling securities, whereby lands mortgaged are required to be sold in the inverse order of alienation, rests upon the reason, that when the mortgagor sells a part of the mortgaged premises without reference to the incumbrance, purporting to convey the fee simple, and retaining a part himself, it is equitable, as between the mortgagor and his grantee, that the part still held by the mort-

*o*

gagor shall be first subjected to the payment of the debt; and this equity having attached to the land, a subsequent purchaser from the mortgagor, with notice, takes it subject to the same equity.

7. But when the first purchaser expressly takes subject to the mortgage, he will have no equity against the mortgagor to compel satisfaction of the incumbrance out of the part retained by him, and consequently none against his grantee of such part. A purchaser consenting to take subject to the mortgage, consents that his part of the land shall remain *pro rata* liable for the mortgage debt.

8. Same—*release of part of mortgaged premises—of the rights of subsequent purchaser.* If a mortgagee, having notice of successive alienations of parts of the mortgaged premises, releases a part then liable for the payment of the debt, he can not charge the other portions of the premises without first deducting the value of the parts released. If he releases from his mortgage that portion of the premises primarily liable, he thereby releases, *pro tanto,* the portion secondarily liable ; and when the mortgage is sought to be enforced against the owner of the latter, he can claim an abatement of his liability to the extent of the value of that portion which should have been made the primary fund.

9. Same—*release of collaterals, by mortgagee—as affecting rights of subsequent purchasers.* Where a mortgagee of lands, on a settlement with the mortgagor, surrenders to the latter certain notes held as collateral security, such notes will not be chargeable against the mortgage debt, in favor of the mortgagor, or purchasers or parties taking subsequent mortgages from him, who are not shown to have dealt with the mortgagor on the faith of such collateral securities being in the hands of the mortgagee.

10. Same—*platting mortgaged premises into lots and streets—the mortgagee and subsequent purchasers.* A mortgagor, without the assent of the mortgagee, can not plat the mortgaged premises and donate streets, alleys and grounds to the public ; but in such case, the assent of the mortgagee will be implied from his act in accepting a stipulated sum per lot sold, and executing releases therefor. But a purchaser of a part of such platted premises, purchasing by the plat, as also junior mortgagees and judgment creditors with liens upon portions of the platted premises, are estopped from insisting that the portions of the mortgaged premises embraced in the platted streets, alleys and ways shall be regarded and treated as premises released, and the value thereof credited upon the mortgage debt.

11. Mortgages—*interest or estate in mortgagor.* The interest or estate remaining in a mortgagor is but the equity of redemption, and this is all that a purchaser from him acquires. A second mortgagee or a subsequent creditor only acquires a lien on the equity of redemption, subject to the rights of the holder of the first mortgage debt.

12. SAME—*partial payment.* A payment on a mortgage debt is an extinguishment, *pro tanto,* of the mortgage lien.

13. SAME—*taxes paid by mortgagee.* A mortgagee has the right to pay taxes assessed against the mortgaged premises, to protect his interests. Aside from this right, when the mortgagor expressly covenants to pay taxes on the premises, and the bill to foreclose shows that the mortgagee has been required to and has paid the same, and asks that an account may be taken in respect thereto, together with the debt, etc., other persons who acquire a title or interest in the land, subject to such mortgage, can not question the right of the mortgagee to pay the taxes and have them included in his decree.

14. SAME—*right of foreclosure—whether affected by champertous contract to assign part of debt.* On bill to foreclose a mortgage, the defendant set up that a contract of complainant for the transfer of a part of the mortgage debt was champertous: *Held,* that this constituted no defense, as, if the contract was champertous, it was void, and the mortgagee had the same right to the mortgage debt as if the contract had never been made.

15. PARTNERSHIP IN LANDS—*prior mortgage for purchase money—lands bought for sale and profit—rights as between the parties, and third persons.* The person in whose name a body of lands was purchased, executed an instrument in writing, reciting "that the four hundred and six acres this day bought of H. F. C., by me, in my name, is one-half the property of H, he having bought the one-half and paid the one-half of the cash payment, * * * and as the same is sold, he is to have one-half of the profits;" and also a similar writing to C, M and C: *Held,* that such writings only bound the maker to pay to H, and to H, M and C, each their proper portion of the net profits arising from the sale of the land, and not to convey the same, and that as the land was bought as an article of commerce, and for speculation, a court of equity would regard it as personal property among the partners interested in the profits.

16. A bought of B a tract of land for $100,000, of which sum $10,000 was paid down, and notes were given for the residue, secured by deed of trust on the land. Afterward, A gave C a written declaration of trust, reciting therein that one-half of such land was the property of C, he having paid one-half of the cash payment, and stating that, as the land was sold, C was to have one-half of the net profits. C made various other payments on the purchase, and assigned his contract with A to D, to secure a debt, and D sold the same to E and F. To secure the note of E, A gave a second mortgage on a part of the land, in which he covenanted that he was seized in fee, and that the premises were free from liens, etc., but it was expressly stipulated that the mortgage or trust deed was made subject to his prior mortgage to B: *Held,* that under A's declaration of trust in favor of C, neither C nor his assignees

could be permitted to assert title or equities against A's trust deed given to secure the purchase money, and that all the rights acquired under the declaration of trust were in subordination to the purchase money trust deed.

17. A party taking a deed to land in his own name, paid a part of the purchase money, and secured the residue by deed of trust on the land. On the same day he gave H a writing, showing the advance by the latter of half of the sum paid, and that he was to receive one-half of the net proceeds of sales of the land. R afterward succeeded, by assignment, to one-half of H's interest: *Held*, that H's interest was one in the profits, if any, to be derived from the sale of the lands purchased, and that R took one-half of that interest, charged with the payment of the unpaid purchase money, and no interest in the land itself.

18. Where one buys land in his own name, giving others an interest in the net profits of any sales he may make, thus making them partners in such profits, and gives the grantor a mortgage on the land to secure the unpaid purchase money, and the person so holding the legal title plats a part of the land and makes sales of some of the lots, and makes payments out of the proceeds of such sales, the other partners will have the right to compel the mortgagee to apply all moneys paid on the indebtedness, or which come to his hands and with which he is justly chargeable, and to charge him with any securities or property which he has appropriated or received the benefit of, and such as may be lost by reason of his not having properly applied them ; but with respect to one of the partners and his assignees, the mortgagee will not be chargeable with the control and management of the business by the mortgagor partner, nor responsible to them for any application by him of the funds derived from the sale of the premises.

19. CONDITION SUBSEQUENT—*rule of construction—not favored in the law.* Conditions subsequent are not favored in law, and a clause will not be construed to be a condition unless the intention is clearly manifested, the inclination being to interpret it as a covenant rather than as a condition.

20. SAME—*who may avail of a condition subsequent.* A breach of a condition subsequent in a deed can be taken advantage of only by the grantor, his heirs or devisees ; and if the grantor can extend the right to declare a forfeiture to his assigns, he or they must make re-entry, or do some act equivalent to re-entry at law, as a court of equity will not lend its aid to enforce a forfeiture for a breach of a condition subsequent.

21. A deed of land to one in trust for the right of way of a railroad company, declared that its purpose was the "building, constructing, maintaining and using thereon a railroad," and the grantee conveyed his title to the company : *Held*, that the use named was a condition

subsequent, and that no one except the original grantor, his heirs or devisees, could take advantage of the condition.

22. After giving a mortgage on a tract of land for a part of the purchase money, the mortgagor conveyed a strip of the land to a railway company for its right of way, the deed reciting, "the tracks laid thereon to be laid and maintained on a level with" another railway named, "or within six inches thereof," and concluding: "In case the said grantee shall not use said land, in manner aforesaid, for the space of six months from this date, or shall discontinue the use of said land for the purposes and as above expressed for a like period, this grant shall terminate and be void; and said grantor, his heirs and assigns, shall hold said land free from all interests and estates of the said grantee," etc. Afterward, the grantor conveyed this part of the mortgaged premises to one C, subject to the right of way of the successor of said company. On bill to foreclose the mortgage, C was made a party defendant, and defaulted. The only rights of certain of the parties defending arose in equity, to subject this property to the payment of the mortgage debt before that held by them could be so applied : *Held,* that they could not insist, in a court of equity, upon having a forfeiture of the right of way for a breach of the condition to maintain its track on a level with the other railroad, etc.

23. CONSTRUCTION OF DEEDS—*rule of construction—of the description of the premises.* Where there is doubt as to the construction of a deed, it shall be taken most favorably for the grantee. Hence, if a deed contains two descriptions of the land, which do not coincide, the grantee may elect that which is most favorable to him.

24. Where the particular description of land in a deed is defective, effect will be given to the general description ; and in case of a repugnancy between the particular and general description, the latter, giving more land, will be accepted; and when the particular description is repugnant to the reference description, each being certain, definite and complete when standing alone, the description by reference to a prior recorded deed will be accepted, although it describes more land.

25. The owners of a tract of land conveyed to J, for a right of way for a railway company, a strip of land "one hundred and fifty feet wide, being seventy-five feet on each side of the following described line," describing it, and J conveyed to the railway company a strip of land "one hundred feet in width, being fifty feet on each side of the following line," describing the same line as in the deed to him, but following the description was added, "hereby intending to convey all the interest vested in said party of the first part by conveyance executed by the following named persons," among whom were his grantors: *Held,* that the latter deed conveyed a strip of land one hundred and fifty feet wide, the same as did the first deed.

26. Cross-bill—*whether necessary—on foreclosure—in order to pro- tect rights of junior mortgagee.* On bill to foreclose a mortgage, the filing of a cross-bill is not necessary for the preservation of the rights of a junior mortgagee to the same premises. He may, under his proper answer, have the court preserve his rights as against the mortgagor in any surplus remaining from the sale of the property after paying the holders of the first mortgage debt.

27. To enable the junior mortgagee, subsequent purchaser or judg- ment creditor to insist, as against the original mortgagee, that the effect of releases of portions of the mortgaged premises by the latter is a dis- charge, *pro tanto,* of the original mortgage debt, it is not necessary for him to file a cross-bill in a suit to foreclose the original mortgage, as he may obtain such relief upon answer, alone.

28. The mortgagor of premises platted the same, and sold a block thereof containing forty-eight lots, for which $1000 was paid down, the purchaser giving notes for the unpaid price, secured by mortgage on the property. The mortgagor paid the $1000 to the mortgagee, and procured the release of the first twenty lots under an agreement to re- lease for $50 a lot. The notes for the deferred payments were placed by the mortgagor in the hands of the mortgagee as collateral security for the principal debt, but on a settlement between them they were re- turned to the payee. On bill by the mortgagee to foreclose his mort- gage, such purchaser filed a cross-bill: *Held,* that as the purchaser could obtain the relief sought under an answer that he could under the cross-bill, there was no error in sustaining a demurrer to the cross-bill.

29. Allegations and proofs—*must correspond.* A bill was filed to foreclose a deed of trust given on a tract of land upon which a railway company had, by grant, a right of way, but neither the original bill, nor any of the subsequent pleadings, in any way sought to defeat the right of the railway company to the right of way, except that it was included in and subject to the original trust deed, and no issue was raised by the pleadings under which the validity of the company's deed could be attacked: *Held,* that evidence offered to show the breach of a condition subsequent in the company's deed was properly excluded.

30. Recording act—*subsequent conveyance or mortgage.* The record of a subsequent deed or mortgage is not notice to the prior mortgagee, nor is the latter required to search the records from time to time to see what other incumbrances have been put upon the land; and one in- terested in the equity, as purchaser, mortgagee or lienor, wishing to protect himself, must bring home to the first mortgagee actual notice of his equities. Hence, where a part of the first mortgaged premises has been released, without actual notice of the rights of second mort- gagees or purchasers of the equity of redemption, the latter can not complain of the enforcement of the prior mortgage.

31. PARTIES—*complainants on bill to foreclose.* Where a mortgagee enters into an agreement with another to transfer to the latter a small portion of the mortgage debt, retaining the legal title and the larger part of the equitable interest, the mortgagee may properly file his bill to foreclose the mortgage in his own name. And when such assignee, at the hearing, is made a party, and answers, consenting to the decree, he will be estopped from elsewhere asserting liability to himself under the mortgage.

32. PRACTICE — *exclusion of evidence—who may complain.* A party who does not offer evidence which the court excludes, and who makes no exception to the ruling, can not assign such ruling for error.

APPEAL from and writs of error to the Appellate Court for the First District;—heard in the court on appeals from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Mr. WILLIAM C. GOUDY, Mr. EDWARD ROBY, and Mr. DAVID M. HILLIS, for the appellants and plaintiffs in error:

The decree must be limited to the pleadings. *Carmichael* v. *Reed,* 45 Ill. 108; *Maher* v. *Bull,* 44 id. 98; *Hall* v. *Towne,* 45 id. 493; *Walker* v. *Ray,* 111 id. 321; *Gage* v. *Reid,* 118 id. 35.

The Boones, holding a second mortgage, had a clear right to file a cross-bill to foreclose it. *Crocker* v. *Lowenthal,* 83 Ill. 579; *Follansbee* v. *Mortgage Co.* 7 Bradw. 486; *Erlinger* v. *Boal,* id. 40; *Hurd* v. *Case,* 32 Ill. 48; *Quick* v. *Lemon,* 105 id. 578; *Shinn* v. *Shinn,* 91 id. 483.

As to the rule for the marshaling of securities, see *Hards* v. *Burton,* 79 Ill. 508; 2 Jones on Mortgages, secs. 1628-1631; Sheldon on Subrogation, secs. 72, 78; *Land Co.* v. *Peck,* 112 Ill. 444; *Hurd* v. *Eaton,* 28 id. 122; *In re Bates,* 118 id. 528; *Wise* v. *Shepard,* 13 id. 47.

Hansbrough was not personally liable to the Clarks. He was not surety for the debt of Colehour, though the land to which he was entitled to subject his lien was a security. *Trotter* v. *Hughes,* 12 N. Y. 79.

The land in which he was interested was surety, and its discharge, or the discharge of securities primarily liable, discharged the first mortgage. *Caleo* v. *Davies,* 73 N. Y. 215; *Mores* v. *Gleason,* 64 id. 204; *Northrop* v. *Hill,* 57 id. 349; *Colgrove* v. *Tallman,* 67 Ill. 96.

Payment upon the principal of a debt secured by mortgage, extinguishes the mortgage to the extent of such payment. *Lowenthal* v. *McCormick,* 101 Ill. 143; *Kellogg* v. *Ames,* 4 Barb. 218; *Bennett* v. *Bates,* 94 N. Y. 262; *Shippen* v. *Whittier,* 117 Ill. 282.

When a settlement is palpably erroneous, whether from fraud or from an undue advantage taken, it should be entirely disregarded. *Sutphen* v. *Cushman,* 35 Ill. 200; *Town* v. *Wood,* 37 id. 517; *Perteet* v. *Crawford,* 51 Miss. 43.

A party can not charge for taxes voluntarily paid, and it was error to charge the taxes paid by the mortgagees. *Borders* v. *Murphy,* 78 Ill. 81; *Durant* v. *Rogers,* 71 id. 121.

The contract with Speer, Kerfoot and Montgomery was champertous. *Newkirk* v. *Cone,* 18 Ill. 449; *Thompson* v. *Reynolds,* 73 id. 11; *Gilbert* v. *Holmes,* 64 id. 555.

The last two cases state the law of Illinois to-day. Other cases on champerty are: *Fetrow* v. *Merriwether,* 53 Ill. 275; *Coleman* v. *Billings,* 89 id. 183; *McGoon* v. *Ankeny,* 11 id. 558; *Railway Co.* v. *Boller,* 7 Bradw. 625; *Norton* v. *Tuttle,* 60 Ill. 130; *Comrs.* v. *Coleman,* 108 id. 591; *Walsh* v. *Shumway,* 65 id. 471.

1 Daniell's Ch. Pr. 190, note 5: "All persons having the same interest should stand on the same side of the suit; but if any such refuse to appear as plaintiffs, they may be made defendants, their refusal being stated in the bill." *Contee* v. *Dawson,* 4 Bland. 264; *Pogson* v. *Owen,* 3 Desaus. 31; *Cook* v. *Hadley,* Cooke, 465; *Morse* v. *Hovey,* 9 Paige, 197; *Bartlett* v. *Parks,* 1 Cush. 86; *Whitney* v. *Mayo,* 15 Ill. 251; *Smith* v. *Sackett,* 5 Gilm. 534; *Lovell* v. *Farrington,* 50 Me. 239.

Mr. William A. Montgomery, for the appellees Robert D., Sarah J. and Harriet S. Clark, and defendants in error.

Mr. C. C. Clarke, for the Baltimore, Ohio and Chicago Railroad Company.

Mr. Pliny B. Smith, for the Lake Shore and Michigan Southern Railway Company.

Mr. Chief Justice Shope delivered the opinion of the Court:

Appellees exhibited their bill in equity, in the circuit court of Cook county, against appellants and others, for the foreclosure of a trust deed given to secure the payment of $90,000 and interest, major part of the purchase price of the four hundred and six acres of land lying in sections 8 and 17, town 37, north of range 15, east of the third principal meridian, in Cook county. Appellees and Henry F. Clark, being the owners of these lands, sold and conveyed them to William H. Colehour, and the trust deed referred to was executed by the purchaser to Voluntine C. Turner, trustee, and duly recorded on August 1, 1871. Subsequently, William H. Colehour platted a portion of the lands in section 8, as the Ironworkers' addition to South Chicago, and recorded the same December 9, 1873. The forty-six blocks shown by the plat were subdivided into nearly two thousand lots, and prior to the filing of the bill of appellees, Colehour had sold and conveyed a large number of these lots, and as to certain of the lots so sold, the trustee, Turner, and Henry F. Clark, under a power given them in the trust deed, had executed releases. Colehour also conveyed to Levi D. Boone other portions of the lands lying in section 17, in trust, with power of sale, to secure the payment of a note for $15,066.47, given by William H. Colehour to William Hansbrough, and the taxes and assessments upon the premises conveyed, and the same was recorded October 20, 1873. Hansbrough assigned this note to Boone, who died intestate

before the filing of the original bill. Appellant Julia N. Brewster purchased block 37 in the addition platted by Colehour, took a deed therefor from Colehour, which was recorded December 24, 1873. Dayton S. Morgan and his co-appellants are, some of them, purchasers of lots in the platted addition, holding deeds of conveyance from Colehour therefor. Others are holders of lot-purchaser's notes, assigned to them by Colehour, secured by mortgages upon the lots sold, while others are judgment creditors of Colehour; and appellant Edward Roby claims as owner of an undivided one-fourth interest, as tenant in common, in equity, with William H. and Charles W. Colehour, in all the unreleased portion of the lands purchased by William H. Colehour of appellees. Appellants, along with a large number of lot purchasers, answered the original bill, and Louisa M. Boone and her co-appellants, and Julia N. Brewster, filed cross-bills. To the Brewster cross-bill appellees demurred, which the court sustained, and the bill was dismissed.

The cause was heard on the original bill, the Boone cross-bill, answers, replications, exhibits, report of the master and proofs. The equities were found with complainants (appellees,) exceptions to the master's report overruled in the main, the Boone cross-bill dismissed, and the amount due complainants fixed at $145,076.82, and decree therefor, with order of sale of the unreleased portion of the premises in a fixed order.

The parties, by their several pleadings, appeals and assignments of error, are grouped as follows: William H. and Charles W. Colehour, whose principal contention is, that the decree is for too great a sum; Louisa M. Boone and Samuel S. Boone, administrators of Levi D. Boone, deceased, and Daniel L. Boone, Samuel S. Boone, Clara B. Hansbrough, Louisa M. Adams, Lucy A. Carpenter and Mary J. Gross, heirs-at-law of Levi D. Boone, who insist there was error in dismissing their cross-bill, and also in requiring the sale of the lands on which they had a junior mortgage lien, *before* other lands of the mortgagor, or which he had sold, and that

the original bill ought to have been dismissed as to their lands; Julia N. Brewster, insisting there was error in sustaining the demurrer to her cross-bill, and dismissing the same, and that the original bill should have been dismissed as to block 37; Dayton S. Morgan, Violet Gray, Frank W. Harding, Joseph Pollak, Lelia P. Roby and Elizabeth G. Stannard, who insist the decree is for too much; that the assets were not marshaled according to priorities, and particularly, that the boundaries of the Lake Shore and Michigan Southern railway lands were not fixed, and so much as lay outside of its one hundred feet, as also the lands occupied by the Baltimore, Ohio and Chicago railroad, were not required to be sold *before* those in which they were interested; and Edward Roby, insisting there was error in not decreeing one-fourth of the unreleased premises to him free of incumbrance, and the residue of the lands, only, sold to satisfy complainants.

The decree of the circuit court was affirmed by the Appellate Court for the First District.

The errors assigned have necessitated the examination of this very voluminous record, and the careful consideration of the elaborate briefs and arguments of counsel, and no discussion is required to determine that the relation of William H. Colehour and appellees is that of principal debtor and creditors; and it is equally apparent that appellees are entitled to have decreed to them such sum as remains unpaid upon the $90,000 indebtedness created and assumed by William H. Colehour at the time his trust deed to Turner took effect, together with the proper advances made to preserve the mortgaged estate, and to subject the lands embraced therein to sale for its payment, unless, through the action of the mortgagor and mortgagees (appellees,) the whole or some part of those lands have been taken out of the operation of that instrument.

In order to determine the amount of such original mortgage indebtedness remaining unpaid, and of the advances for the

preservation of the estate, the parties, mortgagor and mort-
gagees, with subsequent purchasers and incumbrancers, were
called upon, and the transactions in which they severally par-
ticipated thoroughly inquired into and probed, until, appar-
ently, the chancellor was in possession of all the material facts
accessible. But it is to be observed, that death and casualty
were not without their influence in placing beyond reach evi-
dence of facts of great materiality; and there is here present
a condition, by no means unusual, of grave doubt and uncer-
tainty, and of sharp conflict, if not of flat contradiction, and
when this condition is met, as it only can be met, by a resort
to common observation, experience and knowledge of human
nature, and a conclusion has been reached by the judicial
mind, all has been accomplished that can be accomplished
under the law. Here were many transactions, covering a
period of nearly ten years—transactions between a great num-
ber of persons and under circumstances most variant; and
while many of the persons were present, and could and did
speak, and many book entries, written memoranda and papers
were brought forward, some of the most prominent actors were
no longer living, and some of the books and written evidence
known to have once existed could not be produced. But,
more than this, the effects produced by the infirmity of age,
and the liability of the human memory to play false in respect
to events long past and details requiring exactness, are con-
siderations not to be wholly disregarded. So that, looking at
the whole case in all its parts, as we have and must, and hav-
ing regard to the strength and bias as well as the weakness of
human nature, accepting here and rejecting there, as seems
most probable and true, we are not prepared to say that the
chancellor erred in his finding as to the amount of the original
indebtedness, and the advances and disbursements to preserve
the mortgaged estate, due appellees and remaining unpaid.

It must be observed, however, that it is insisted on the part
of appellants, that some arrangement was made in the fall of

1873, between the Colehours, and Henry F. Clark, acting for himself and his brother and sisters (appellees,) by which certain of the proceeds derived from the sale of the land and lots was to be applied upon this indebtedness to the Clarks, and other portions of such proceeds were to be used by the Colehours in improving the property and putting it upon the market. It is impossible, in any reasonable limit, to review the evidence and arguments based upon this contention, or of the subsequent transactions alleged to have grown out of such agreement; and we are compelled to content ourselves with saying, that upon consideration of the whole case we are not prepared to say that the chancellor has erred in respect of the items entering into the account and going to make up the claim under the original Turner trust deed. It is, however, claimed, that there were certain charges against, or sums that should have been credited upon, the amount secured by said trust deed, and which were rejected by the master and the chancellor, that would seem to demand further consideration.

It is evident from the record, that the Clarks executed, or thought they were executing, releases to property sold by Colehour, in excess of amounts paid thereon, and it also appears that sundry notes, evidences of indebtedness and stocks were placed or came into the hands of Gen. Clark, which, upon one hand, it is contended, should have been credited upon such indebtedness, while, upon the other hand, it is urged that they were placed there simply as collateral to the principal debt, and were subsequently returned to Colehour. One of these items was $50,000, at face value, of the capital stock of the Nes Cilicon Steel Company, received by Gen. Clark from the Colehours, and which, by the receipt given therefor at the time, (November, 1873,) was "deposited with me (H. F. Clark) as further security on the land released," and "to apply on the notes of W. H. Colehour aforesaid, at the market value at the time of transfer, should such transfer hereafter be made."

It is to be remarked, first, that no transfer of this stock was ever made; nor does it appear, by any satisfactory proof, that such stock had any market value. It is true, W. H. Colehour testifies it was worth one hundred cents on the dollar; but, upon cross-examination, it is evident that he did not intend to testify to the market value. He shows absolutely that he had no knowledge of the worth of these stocks; and it is made to appear, by evidence we think competent against the Colehours, that the stocks at the date, or at any time subsequent to the date, of their deposit, were substantially worthless. Twenty odd acres of the land had been released by the Clarks to enable Colehour to induce the location of these steel works upon this tract of land; but it appears, beyond creating a considerable indebtedness, nothing was done by the steel company. In addition to this, on the 21st of March, 1874, this stock, together with the other collaterals, or notes and securities claimed by the Clarks to be held as collaterals, were returned to the Colehours and accepted and receipted for by them. At that time substantially half of the principal debt was due and unpaid. It is insisted by the Colehours that they were forced to accept back such collaterals by the attorney of the Clarks, Joseph P. Clarkson. We can not enter upon a discussion of this question; but it is, we think, apparent, that the whole transaction, when taken together, shows that it was never intended, either by the Colehours or by the Clarks, that there was to be an application of any of the securities held by Clark, unless they were paid. There is, to our minds, no way of escaping the conclusion that the settlement of March 21, 1874, is binding upon the Colehours. If it was then understood that this stock and the other collaterals were received in payment by the Clarks, or were properly chargeable to them, the Colehours had a perfect right to insist upon credit therefor, and if they were of any such value as is now contended, would have much more than satisfied the mortgage indebtedness then due. This they saw proper not to do, and they are bound, not-

withstanding the alleged coercion, which it is not contended was duress in any legal sense, by their action in the premises. It is also sought to be shown that these bonds were received by the Clarks in consideration of the release of the twenty odd acres of land to be conveyed to the steel company; but we are not satisfied that the weight of the evidence, when the circumstances are all considered, sustains the contention.

What is here said in respect of the settlement of March 21, 1874, applies with equal force to the McLennan, Sarah E. Andrews, Weeks & Bennett, Julia and William S. Brewster notes, and other notes then surrendered by the Clarks to the Colehours. We are of opinion that the chancellor was justified in finding that they were not chargeable against the mortgage debt in favor of the Colehours. Nor do the other appellants, purchasers and lienors under William H. Colehour, stand in any better position. It is not shown, as we think, that any of them dealt upon the faith of such securities, or that they altered their position in consequence of such securities being in the hands of the Clarks. The burden was upon appellants to show payment, or such state of facts as would estop the mortgagees. We are not surprised that, while we are treated to substantially fourteen hundred pages of printed matter, counsel have been unable to succinctly state the case; nor do we deem it important to enter upon that task.

The legal principle insisted upon, and the application of which to the facts of this case has occasioned such earnest discussion, is the equitable doctrine of marshaling securities. To that doctrine this court is fully and unequivocally committed, and it is to be found illustrated in a long, unbroken line of decisions. No more succinct statement of the general doctrine can be found than that formulated by Mr. Justice Lawrence, in *Iglehart* v. *Crain*, 42 Ill. 261, namely, "that where there are two creditors standing in equal equity, one of whom has security upon two funds, and the other upon only one of the two, the former is required to proceed primarily against the

fund upon which the latter has no claim." The holder of the security on two funds, it is said, is compelled to shape his own remedy so as to preserve, if possible, the equity of the one whose lien extends to but one fund. (1 Pomeroy's Eq. sec. 396.) So a creditor having a judgment lien upon several parcels of property, part of which has been taken in satisfaction of a junior judgment, or purchased *bona fide* from the judgment debtor, leaving a portion free from junior incumbrance, or unsold, the prior judgment creditor must first resort to the latter fund for satisfaction. (*Marshall* v. *Moore*, 36 Ill. 321; *Hurd* v. *Eaton*, 28 id. 122.) But the principle does not apply where a creditor has a lien upon two funds belonging to two separate debtors, and a creditor of one of the debtors has a lien upon one of the funds. (*Wise* v. *Shepherd*, 13 Ill. 41.) Creditors of a common debtor alone can invoke this right, (1 Story's Eq. sec. 642; 3 Pomeroy's Eq. sec. 1414,) and it has no application as between creditor and debtor. (*Rogers* v. *Meyers*, 68 Ill. 92.) Nor will the rule be applied to the injury of the prior creditor,—*e. g.*, where the fund is dubious, or only to be reached by litigation; or so as to delay the prior creditor, or prevent him from realizing his whole debt, (1 Story's Eq. sec. 645, note a, and cases cited; 3 Pomeroy's Eq. sec. 1414; *Hurd* v. *Eaton, supra*,) or to impair his security. (*Iglehart* v. *Crain, supra; Sweet* v. *Redhead*, 76 Ill. 374; *Palmer* v. *Snell*, 111 id. 161; 1 Story's Eq. sec. 633; 3 Wait's Actions and Defenses, 175.) So in the case of successive mortgages, and as between a mortgagee and subsequent *bona fide* purchasers from the mortgagor of portions of the mortgaged premises.

It may be stated as a general rule, that every one taking a mortgage on real estate is bound to know, that by law there still remains an estate in the mortgagor subject to sale and transfer, either in its entirety or in parcels. Such estate may be re-mortgaged, voluntarily sold and conveyed, or subjected to sale on execution; and in such case the subsequent mortgagee or purchaser may insist that the portion of the estate

retained by the mortgagor shall first be subject to the mortgage debt, and that the interests of subsequent mortgagees or purchasers shall be liable therefor in the inverse order of alienation. (*Iglehart* v. *Crain, supra; Matteson* v. *Thomas,* 41 Ill. 110; *Lock* v. *Fulford,* 52 id. 166; *Tompkins* v. *Wiltberger,* 56 id. 385; *Niles* v. *Harmon,* 80 id. 396; *Hosmer* v. *Campbell,* 98 id. 572; *Land Co.* v. *Peck,* 112 id. 408.) The interest or estate so remaining in the mortgagor is but the equity of redemption, and this is all that a purchaser acquires. (*Edgerton* v. *Young,* 43 Ill. 464; *Dodds* v. *Snyder,* 44 id. 53.) A second mortgagee or a subsequent judgment creditor only acquires a lien on the equity of redemption, subject to the rights of the holder of the first mortgage debt. (*Dodds* v. *Snyder, supra; Smith* v. *Dinsmoor,* 119 Ill. 656.) But where a part of the mortgagor's equity has passed from him by sale under execution, the mortgagee's right of foreclosure will be limited to such amount as may equitably be enforced against such parcel, though the mortgagor may be liable for a larger sum. (*Gorham* v. *Farson,* 119 Ill. 425.) It is also to be borne in mind, that the record of a subsequent deed or mortgage is not notice to the prior mortgagee; nor is the latter required to search the records, from time to time, to see whether other incumbrances have been put on the land; and one interested in the equity, as subsequent purchaser, mortgagee or lienor, wishing to protect himself, must bring home to the first mortgagee actual notice of his equities. (*Hosmer* v. *Campbell, supra; Matteson* v. *Thomas, supra; Iglehart* v. *Crain, supra;* 2 Jones on Mortgages, sec. 1624.) Hence, where a part of the first mortgaged premises has been released, without actual notice of the rights of second mortgagees or purchasers of the equity of redemption, the latter can not complain of the enforcement of the prior mortgage. (*McMillan* v. *McCormick,* 117 Ill. 79.) It is also well settled, that a payment upon the mortgage debt is an extinguishment, *pro tanto,* of the mortgage lien. (*Redmond* v. *Packenham,* 66 Ill. 434.) And if the mortgagee, having notice of successive

alienations of parts of the mortgaged premises, releases a part then liable for the payment of the debt, he can not charge the other portions of the premises without first deducting the value of the parts released. (2 Jones on Mortgages, sec. 1631.) As said by this court in the *Iglehart case:* "If the mortgagee, with actual notice of the facts, releases from the mortgage that portion of the premises primarily liable, he thereby releases, *pro tanto*, the portion secondarily liable. When the mortgage is sought to be enforced against the owner of the latter, he can claim an abatement of his liability to the extent of the value of that portion which should have been made the primary fund." (See, also, *Matteson* v. *Thomas, supra; Briscoe* v. *Power*, 47 Ill. 447; *Hurd* v. *Eaton, supra; Warner* v. *Bank*, 4 Bradw. 305.) Nor is it necessary that the junior mortgagee, purchaser or judgment creditor, desiring to insist, as against the original mortgagee, that the effect of releases of portions of the mortgaged premises by the latter was a discharge, *pro tanto*, of the original mortgage debt, should for this purpose resort to a cross-bill, for it is a common practice to afford this character of relief upon answer. (*Iglehart* v. *Crain, supra; Land Co.* v. *Peck, supra; Soles* v. *Sheppard*, 99 Ill. 616, and cases cited.) Nor can it be doubted that the mortgagor can not, without the assent of the mortgagee, plat the mortgaged premises, and donate streets, alleys and grounds to the public; but in such case the assent of the mortgagee will be implied from the act of the latter in accepting a stipulated sum per lot, and executing releases therefor. (*Smith* v. *Heath*, 102 Ill. 130.) And it is considered that a purchaser of a part of such platted premises, purchasing by the plat, as also junior mortgagees and judgment creditors with liens upon portions of the platted premises, are estopped from insisting that the portions of the mortgaged premises embraced in the platted streets, alleys and ways shall be regarded and treated as premises released, and the value thereof credited upon the mortgage debt.

As in the further discussion of the many questions arising upon this record application must be made of the general principles of the law as illustrated by the former decisions of this court, and to avoid repetition, we have thought it apt to present them in succinct and connected form, and the various contentions hereafter considered will, we think, in the main, be found to fall within the doctrines thus announced.

It is contended, on behalf of Julia N. Brewster, that the court erred in sustaining the demurrer to her cross-bill. No good purpose can be subserved in attempting to epitomize this cross-bill, covering, as it does, some thirty pages of printed abstract, and it is sufficient to say that no facts are therein stated; nor would she be entitled to any relief thereon that she could not have upon proper answer filed. The demurrer was sustained upon this ground, and there was no error therein of which she can be heard to complain.

It is further contended on the part of Mrs. Brewster, that the court erred in decreeing the sale of her premises for the satisfaction of the mortgage indebtedness secured by the Turner trust deed, and in not decreeing that the same was freed therefrom. It is nowhere contended that Mrs. Brewster, in making her purchase of this block, purchased for less than its full value. It is further undisputed that at the time of the purchase she paid $1000 of the purchase money, which is shown to have been turned over to the holders of the original mortgage indebtedness, and in consideration thereof lots 1 to 20, inclusive, in said block 37, were released, in accordance with the trust deed, from the operation of that instrument. This is shown by both Brewster and Colehour, and is found by the master. It is clear, therefore, that so far as lots 1 to 20, inclusive, are concerned, they are not within the operation of the Turner trust deed. This release seems to have been executed in pursuance of an agreement between the Clarks and W. H. Colehour, that upon payment of $50 per lot, releases therefor would be executed. Although the purchase here was

of the forty-eight lots in block 37, the $1000 paid would represent twenty lots under said agreement, and Joseph P. Clarkson, attorney in fact of the Clarks, chose to release said lots from 1 to 20. In respect of the remaining lots of the block, from 21 to 48, inclusive, they were included in the decree by the designation of "unreleased lots," and held to be primarily liable for the payment of the original mortgage indebtedness, but no order is made for their sale, the court having ordered the sale of certain lots and lands, not, however, including said lots, reserving to the court the making of a further order of sale, if necessary. The facts shown justify the decree as far as rendered. It is shown that the mortgagees, the Clarks, received the $1000 cash before mentioned, but it was understood, both by Brewster and the Clarks, that it was paid upon the twenty lots released, and was so paid and accepted.

In respect of the residue of the consideration for said lots two notes were given, which, it appears, had been reduced by payments some time prior to March 21, 1874, to $2386.87 each, and which were secured by a mortgage on said block. Some time prior to the date last mentioned, they had been placed by the payee, W. H. Colehour, with others, in the hands of Henry F. Clark, as collateral to the principal debt. On settlement had at that date, these notes, with others, were delivered back to the payee. It does not appear that anything was paid thereon to the Clarks, nor does it appear that by any arrangement the principal debt was or should be credited with the amount of said notes. If, upon further hearing, it should be found necessary to order the sale of this property, it will only be done after the exhaustion of the lands and lots held by the grantor in the Turner trust deed, or subsequently conveyed, and after crediting the principal debt with such sums as should be charged against the same on account of property released, in accordance with the principles in this opinion stated.

The next contention considered is that of appellants, representatives and heirs of Levi D. Boone. At the time of the purchase and conveyance of the lands to W. H. Colehour, $10,000 of the purchase price was paid in cash, and this money appears to have been furnished, $5000 by William Hansbrough, and $5000 by F. M. Corby, Wesley Morrill and Charles W. Colehour; and W. H. Colehour, in whose name the purchase was made, who took title from the Clarks, and who executed the notes for the $86,000 portion of the purchase price of the land, and the original trust deed to secure the $90,000 unpaid portion of the purchase price, gave William Hansbrough a written instrument, under his hand and seal, dated July 31, 1871, reciting, "that the four hundred and six acres this day bought of H. F. Clark by me, in my name, is one-half the property of William Hansbrough, he having bought the one-half and paid the one-half of the cash payment, to-wit, $5000, and, as the same is sold, he to have one-half of the profits." And he also gave to Corby, Morrill and C. W. Colehour a written instrument, under his hand and seal, dated August 1, 1871, reciting, that the persons last named were, "together, jointly and equally, interested in one-half of the four hundred and six acres * * * this day, to-wit, July 18, 1871, bought of H. F. Clark and others, they having advanced one-half of the purchase money advanced in cash, to-wit, $10,000, they paying $5000 for the purchase of the same," thereby agreeing "that out of the profits, if any be realized from the sale of said land, the said parties above, jointly, shall be entitled to receive the one-half of the net profit from any sale of said land." Neither of these instruments was placed on record.

In respect to the second instrument above referred to, a controversy having arisen between Wesley Morrill and the Colehours, Morrill proceeded by his bill in equity to establish his rights and to enforce the specific performance thereof, and for an account of the proceeds of sales made by W. H. Colehour, resulting in a decree in the circuit court dismissing the bill, and

which decree, on appeal to this court, was affirmed. (*Morrill v. Colehour et al.* 82 Ill. 618.) From that case it appears that Corby, Morrill and C. W. Colehour entered into an agreement with W. H. Colehour, by which the former abandoned all claim to the property or to any profits that might be realized from its sale, and the latter agreed not to look to them for any part of the purchase money; and in the course of the opinion the court said: "The written agreement executed by W. H. Colehour only binds him to pay appellant and the others equal portions of the one-half of the net profits arising from the sale of the lands. It in no event bound him to convey the land. * * * By this agreement, this was not an interest in or title to the land, but it was an agreement to give appellant and pay to him profits that might be realized from the sale of the land. * * * The purchase was made for the purpose of sale and the acquisition of profits. It was not bought to hold as land, but simply as an article of commerce and for speculation, and for that reason equity regards it as personal property among the partners. In such cases the intention of the parties stamps the character of the transaction."

The foregoing case is referred to for two purposes: First, as showing that whatever right Corby, Morrill and C. W. Colehour may have acquired by their $5000 contribution towards the purchase price of the lands, and under the instrument of August 1, 1871, had been relinquished in favor of W. H. Colehour; and second, as showing the relation which William Hansbrough sustained towards W. H. Colehour, and his rights in the lands under the instrument of July 31, 1871. Although not identical in language, these two instruments are of the same legal import. The parties engaged in a common enterprise, namely, the purchase of lands in the name of one,— not to be held as lands, but as an article of commerce, and for speculation; and the fact that they shared in contributing the purchase money, and agreed to share in the profits that might arise from the sale of the purchased commodity, stamped the

transaction as in effect a partnership, with some, at least, of the incidents and obligations growing out of that relation.

That Hansbrough regarded himself as bound as a joint purchaser, (in his testimony he states he was a half partner in the purchase,) is strongly supported by his subsequent conduct. Between the date of the purchase and the 2d day of December, 1872, he paid three installments, of $200 each, interest accrued on the Mary P. M. Palmer note, and also $6125.35 interest accrued on the twenty notes held by appellees. And on December 28, 1872, Hansbrough assigned his contract with W. H. Colehour, and transferred "unto Levi D. Boone all my (his) right, title and interest in and to the within contract of purchase of land," as security for an existing indebtedness of Hansbrough to Boone. But notwithstanding such transfer, in February, March and June of 1873, Hansbrough made further payments for account of the land purchase, namely, "cash paid Gen. H. F. Clark, $1505; taxes on Clark land, $185.71; interest on Clark land, $75;" and finally, on October 18, 1873, Hansbrough had a full settlement with the Colehours, when his interest in the land purchase, including the moneys expended by him and his share of supposed profits, was found to be $20,466.87. It is further to be stated, that about the date last named, Levi D. Boone, by his attorney in fact, William Hansbrough, sold and transferred, by indorsement thereof, all his interest in the Hansbrough contract of July 31, 1871, "and the land therein mentioned, to Charles W. Colehour and Edward Roby." The consideration of this assignment, as alleged, was $15,066.47 from C. W. Colehour and $4400 from Roby. The portion coming from Roby was evidenced by his three notes,—one for $800 and two for $1800 each,—payable in one, two and three years, respectively, from August 16, 1873, payable to William Hansbrough; and the portion coming from C. W. Colehour was evidenced by the note of W. H. Colehour, dated August 16, 1873, for $15,066.47, payable two years thereafter, with interest at six per cent, to

William Hansbrough. To secure this last named note, W. H. Colehour, by his trust deed dated August 16, 1873, conveyed the unsubdivided lands in section 17, and which deed was recorded October 20, 1873, to Levi D. Boone. It is evident the $15,066.47 evidenced by this note of W. H. Colehour was the property of Levi D. Boone, and is so treated in this litigation. In the trust deed last mentioned it was expressly provided that the trustee should release from the lien thereof, on payment by the grantor, at the rate of one acre for $120, such payments to be credited on the secured note, and that the lands might be subdivided into lots, and released by lots or blocks. The grantor therein covenanted that he was seized in fee, that the premises were free from liens, and that he would warrant and defend, etc., but expressly stipulated that the conveyance was made "subject to one given by grantor hereof to Voluntine C. Turner, covering the same lands, with other lands."

The rights of appellants, the legal representatives and heirs of Levi D. Boone, and which are thought to be injuriously affected by the action of the court in denying them any relief whatever under their cross-bill, as can be readily seen, are predicated primarily upon the act of William Hansbrough in contributing $5000 towards the purchase of the Clark lands, and the subsequent payments made by him upon the deferred purchase money notes, and for taxes, etc.; upon the instrument executed by W. H. Colehour at the time the $5000 was so paid, and its subsequent assignment and transfer, as shown; and finally, upon the trust deed of W. H. Colehour, conveying to their ancestor that part of the purchase lands lying in section 17 described, to secure the indebtedness of over $15,000, evidenced by the note of W. H. Colehour, before mentioned, to their ancestor, remaining unpaid, and the action of the Clarks in releasing from the operation of such original trust deed divers lots—parcels of the lands embraced therein—to subsequent purchasers; and to fully comprehend their conten-

tion, the further statement seems necessary:—W. H. Colehour platted the "Ironworkers' addition to South Chicago." In this plat and subdivision was embraced the south fractional half of fractional section 8, except certain railroad rights of way, containing some forty-six blocks and nearly two thousand lots, with the necessary streets and alleys; and, in conjunction with Ester E. Taylor, the part of the lands lying in the north half of section 8 was also platted as "Taylor's First addition to South Chicago." The Ironworkers' addition was certified August 16, 1873, and recorded December 9, 1873.

In respect of the first ground upon which these appellants predicate their criticism of the decree, we have already seen that the person through whom they claim by virtue of the assignment of the contract of July 31, 1871, (William Hansbrough,) was a partner with W. H. Colehour in these lands, and that under such contract he was entitled to receive only a share of the profits, if any, arising out of their sale and disposition. Under the assignment of that instrument it was manifest their ancestor acquired the interest of Hansbrough only. Under the declaration of trust by W. H. Colehour in favor of Hansbrough, neither he nor his assignees could be permitted to assert title or equities against the Turner trust deed, given to secure the purchase money of the lands, by W. H. Colehour. All of the rights acquired under and by virtue of such declaration must necessarily be in subordination to the purchase money mortgage. It can not be doubted but that Hansbrough, upon acceptance of the declaration of trust, had full notice of the transaction by which W. H. Colehour had acquired and held the title to these lands; and the declaration assigned to Boone, upon its face, gave notice to him of the relation that Hansbrough bore to the title. And it also seems clear to us, that the change in the security, whereby the debt of Hansbrough to Boone, by novation, became the debt of W. H. Colehour, and the security therefor to Boone was changed from the declaration of trust in favor

of Hansbrough by W. H. Colehour to the trust deed of W. H. Colehour to Boone to secure such indebtedness to Boone, were parts and a continuation of the same transaction. We do not deem it necessary now to enter upon a discussion of the liability of Hansbrough, as partner of W. H. Colehour, for the purchase money of the land, but it is sufficient for our present purpose that the circumstances are such as to carry home to Hansbrough and Boone, notice of appellees' rights. If any doubt could exist in respect of notice of the rights of appellees, and that the parties dealt with the understanding that the rights they were acquiring were subject to the rights of appellees, it is effectually removed by the trust deed sought to be foreclosed by the cross-bill of these appellants,—that is, the trust deed of W. H. Colehour to Boone, before mentioned. As we have seen, that deed is, by its terms, expressly made subject to one given by the grantor, W. H. Colehour, to Voluntine C. Turner, covering the same land and other lands. This clause of the deed receives additional force from a consideration of the relation of Hansbrough to this transaction. By the declaration of trust in his favor he was to have one-half of the profits derived from the sale of the lands purchased from the Clarks; and the trust deed given to secure, in fact, his advances on account of and profits in the transaction, very properly and necessarily was given subject to the trust deed given for the purchase money. It is clear, therefore, that the interest of Levi D. Boone was subject to the rights of appellees, and that these appellants occupy the same relation their ancestor did.

It is likewise insisted, that the court erred in the order in which the land covered by the Boone trust deed was required to be sold. Certain of the lands, including those covered by this trust deed, were held by the court not to fall within the equitable rule of sale in the inverse order of alienation. The court, by its order, required the sale of these lands, and of all lots conveyed subsequent to July 13, 1876; and as the trust

deed to Boone was recorded October 20, 1873, it is insisted that the court erred in requiring the sale of this property until all property conveyed thereafter had been subjected to the payment of the first mortgage debt. We are of opinion the court did not err in the respect indicated. The equitable rule of marshaling securities, whereby the lands mortgaged are required to be sold in the inverse order of alienation, as said by this court in *Briscoe* v. *Power, supra*, "rests upon the reason, that where the mortgagor sells a part of the mortgaged premises without reference to the incumbrance, purporting to convey the fee simple, and retaining a part himself, it is equitable, as between the mortgagor and his grantee, that the part still held by the mortgagor should be first subjected to the payment of the debt; and this equity having attached to the land, a subsequent purchaser from the mortgagor, with notice, takes it subject to the same equity. But it is evident that this reasoning has no application to a case like the present, where the first purchaser expressly takes subject to the mortgage." And it was there held, that in such case the purchaser has no equity against the mortgagor to compel satisfaction of the incumbrance out of the part retained by him, and, consequently, none against his grantee of such part, and that the purchaser consenting to take subject to the mortgage, consents that his part of the land shall remain, *pro rata,* liable for the mortgage debt. Here, as we have seen, the deed to Boone was taken expressly subject to the trust deed to Turner, and those holding under it possess no equity against the grantor therein requiring that the lands retained by him should be first sold. It would seem that this should be conclusive in favor of the correctness of the decree. Moreover, Boone took this trust deed with notice, both actual and constructive, of the trust deed to secure the debt due appellees, and with actual notice that the interest of Hansbrough in the premises was dependent upon profits to be realized from the sale thereof. And it is equally clear that this trust deed was taken by Boone to se-

cure Hansbrough's interest to be derived and realized upon by the sale of the land and lots by W. H. Colehour. It is true that Boone sold and assigned to C. W. Colehour and Edward Roby his interest in the declaration of trust which he had acquired, by assignment, from Hansbrough; but it is shown, upon the face of that instrument, that such interest was half the profits realized from a sale of the land, and that only. The entire transaction contemplated the sale of the property by Colehour at a profit over and above the cost price secured to be paid to appellees; and it would be grossly inequitable to permit Hansbrough, or his assignee with notice, to take the property from the purchasers, from whom alone his interest and profits were to be realized, to pay the principal debt, and thereby relieve the property upon which he had taken security for such profits, from the common burden.

It is further insisted, that at least these appellants were entitled to a decree, under their cross-bill, foreclosing their trust deed as against W. H. Colehour, and the court therefore erred in dismissing the cross-bill. The filing of a cross-bill is not necessary for the preservation of the rights of a junior mortgagee to the same premises, as has been seen; and if appellants desire, they may, under their answer, move the court, and it will be the duty of the chancellor,—and which may yet be done in this cause,—to preserve their rights, as against Colehour, in any surplus remaining from the sale of the property after the payment of the amount due appellees.

In respect of the errors assigned by appellant Edward Roby, it is apparent, from what has preceded, that he took whatever interest he acquired, under the declaration of trust by W. H. Colehour to Hansbrough, dated July 31, 1871, and by assignment thereof through Boone,—Roby taking, as is contended, one-half of the interest declared to be in Hansbrough, whatever that might be, and nothing more. It is also apparent, from what has preceded, that he thereby took the interest, only, that Hansbrough had thereunder, which was an interest

in the profits, if any, to be derived from the sale of the lands
purchased from the Clarks, and necessarily took such interest
charged with the payment of the purchase price of the land,—
his interest not being, as we have seen, an interest in the land,
but in the profits, only. But it is contended that the Clarks
had notice of his interest, and that therefore they were bound
to apply the securities held by them, in good faith, in extin-
guishment of their mortgage debt, so as that his interest might
be protected. Conceding all that is contended, we have found
that the chancellor has made proper application of all moneys
and securities with which the mortgagees are properly charge-
able. It is, however, further contended, that Roby is not
bound by the settlement and agreement of March 21, 1874,—
that such settlement between Colehour and the Clarks was not
correct or made on a correct basis, and therefore the same is
not binding upon him, and that he has a right to go back of
such settlement, and show the true state of account. If this
be also conceded, as we have already shown, the evidence is
insufficient to show that the mortgagees were chargeable with
the items objected to by appellant, or that the account was in
other respects inaccurate.

The relation existing between Hansbrough, and those claim-
ing under and through him, and W. H. Colehour, as previously
indicated, and as found in the *Morrill case,* before referred to,
was that of persons interested in the profits to be derived by
the sale of the lands by Colehour, and, in a sense, partners;
and they can not, as against appellees, be heard to complain
that Colehour misapplied the funds received by him from the
sale of the lands and lots sold, unless the Clarks in some way
participated in such misappropriation. As we have seen, it
may readily be conceded, as it is, that they would have a right
to compel the application of all moneys paid upon the indebt-
edness, or which came to the hands of the Clarks with which
they were justly chargeable, and with any securities or prop-
erty which the Clarks appropriated or received the benefit of,

and also such as was lost, if any was shown, by reason of the Clarks not having made proper application thereof. But as respects Hansbrough and his assignees, appellees are not chargeable with the control and management of the business by Colehour, nor responsible to them for any application by Colehour of the funds derived from the sale of the premises. Being practically partners, they were bound by the acts of Colehour.

As to the objection that the court erred in including in the amount for which decree was rendered, the taxes paid by appellees to protect the estate and their mortgage security, there was no error, in our opinion. The right of the mortgagee to pay taxes assessed against the mortgaged premises, to protect his interests, and have such payments tacked, in equity, to the mortgage debt, upon foreclosure, has been so repeatedly sanctioned that citation of authority is unnecessary. Aside from this, it was expressly covenanted in the original trust deed to Turner, that the grantor would pay the taxes and assessments upon the premises, and it was averred that appellees had been required to pay, and had paid, the same, and it was prayed that an account might be taken of the same, together with the debt, and interest due thereunder. Appellants having acquired title or interest subject to such trust deed, are not in condition to question the right of appellees to protect their security in the manner they did.

It is further contended, that under an agreement entered into between the Clarks, appellees, and Charles E. Spear and others, this cause should have been brought in the name of Spear, Kerfoot and Montgomery, and not in the name of the Clarks. There is no merit in this contention. At most, the agreement purported to transfer a portion of the mortgage debt to the three persons named, and if valid in equity, the larger part was retained by appellees, the Clarks, and the cause was properly brought in their name. (*Hopkirk* v. *Page,* 2 Brock. 20 ; Wiltsie on Foreclosure, sec. 16.) It clearly ap-

pears, that if the agreement amounted to an equitable assignment of a portion of the indebtedness, the appellees (original mortgagees) retained the legal title, as well as a large equitable interest in the mortgage debt, and had an undoubted right to file this bill. Spear, Kerfoot and Montgomery were, at the hearing, made parties defendant, and answered, consenting to the decree, and would therefore be estopped from elsewhere asserting liability to themselves under said mortgage. *Sapp* v. *Phelps*, 92 Ill. 588.

It is also insisted, that the contract between the Clarks and Spear, Kerfoot and Montgomery is champertous, and that in some way the right of appellees to relief is thereby affected. It is plain this can not be so. If it be conceded that the contract is champertous, as contended, it is void, and the Clarks have the same rights in respect of this mortgage debt as if it had not been entered into.

There remain to be considered the errors assigned by plaintiffs in error, Dayton S. Morgan, Violet Gray, Frank W. Harding, Joseph Pollak, Lelia P. Roby and Elizabeth G. Stannard, their writ of error having been sued out after the appeal before referred to had been taken. The first assignment of error—that the decree was for too much—has already been considered. The second, that the securities were not properly marshaled according to priorities; and the third, that the decree did not limit the boundary of the right of way of the Lake Shore and Michigan Southern railway to one hundred feet in width, and require the sale of the fifty feet also claimed by said railway company and lying outside of the one hundred feet, together with the sixty-six feet right of way of the Baltimore, Ohio and Chicago railroad, before sale of the lands claimed by said plaintiffs in error,—will now be considered.

The consideration of the second assignment is necessarily involved in the third, as, in the presentation by counsel for plaintiffs in error, it relates solely to the failure of the court to make the proper order in respect of said rights of way.

And first, as to the Baltimore, Ohio and Chicago railroad. It appears that on July 30, 1874, W. H. Colehour, by his deed of that date, conveyed to the Baltimore, Pittsburg and Chicago Railway Company, Illinois division, (since changed, as conceded, and now known as the Baltimore, Ohio and Chicago Railroad Company,) a strip of land sixty-six feet wide and fourteen hundred feet long, through a portion of the mortgaged premises, as right of way, adjoining on the north-west the right of way of the Lake Shore and Michigan Southern railway, as located through the same lands.

A sufficient answer to the objection of a majority of plaintiffs in error would be, that in marshaling the securities the decree requires the sale of the right of way of this company before sale of the premises claimed by plaintiffs in error, their interests having been acquired first in the order of alienation. There is, however, a two-fold answer to the contention. The deed from W. H. Colehour conveying this right of way conveys "right of way for a railroad  *  *  *  over the following described real estate, to-wit," and then follows description. To this is added: "The tracks laid thereon to be laid and maintained on a level with the Michigan Southern and Northern Indiana Railroad Company, or within six inches thereof. In case said grantee shall not use said land, in manner aforesaid, for the space of six months from this date, or shall discontinue the use of said land for the purposes and as above expressed for a like period, this grant shall terminate, and become and be void; and said grantor, his heirs and assigns, shall hold said land free from all interests and estates of the said grantee, and all persons and corporations claiming under it." It is conceded that the railroad company, within the time limited, went into the use of said land for the purposes mentioned in the deed, and has ever since continued to use it as its right of way. Two contentions are made: First, it is said that the whole right of way has been forfeited, for the reason that the railroad company, in building its track and maintaining

the same, did not build and has not maintained the same
upon a level with the track of the Lake Shore and Michigan
Southern railway, or within six inches thereof, and that there-
fore the property has reverted, and should be first sold to pay
the mortgage debt.

Before the master, and at the hearing, W. H. Colehour
offered evidence tending to show that this company's track
was not built upon a level, or within six inches of the level,
of the other railroad track named,—which the court excluded.
This evidence was not offered on behalf of the plaintiffs in
error, nor its exclusion excepted to by them, and they are in no
condition to complain of the action of the court in that regard.
Again, neither the original bill, nor any of the subsequent
pleadings in the cause, in any way set up or sought to defeat
the right of the railroad company to its right of way, except
as the same is averred to be included in and subject to the
original trust deed, and no issue was raised by the pleadings
under which the validity of the company's deed could be at-
tacked. See *Farrar* v. *Payne*, 73 Ill. 82; *Home Ins. Co.* v.
*Myer*, 93 id. 271; *Walters* v. *Defenbaugh*, 90 id. 241.

But it is insisted that the language of the deed providing
that the tracks shall be constructed on a level with the tracks
of the Lake Shore and Michigan Southern railway, is in the
nature of a condition subsequent. The rule is well established
that this class of conditions is not favored in law, and a clause
will not be construed to be a condition unless the intention is
clearly manifested,—the inclination being, to interpret them
as covenants rather than as conditions. But it is unneces-
sary to pause here to discuss or determine that question, for
if the clause be construed as a condition, it is clear that these
plaintiffs in error are not in a position to take advantage of
a forfeiture. A breach of a condition subsequent can be
taken advantage of only by the grantor, his heirs or devisees.
(2 Washburn on Real Prop. secs. 11, 12, and authorities cited.)
But if it be contended that the right is extended by the latter

clause of the deed quoted, it is to be observed that it was to Colehour and his heirs and assigns, only.

On July 22, 1877, Colehour conveyed this part of the mortgaged premises to Jared M. Clark, "subject to Baltimore and Ohio railroad right of way." Said Clark was made a party to the bill, and defaulted, and is making no objection to the decree. It is not pretended that Colehour, or his grantee, Clark, or any person who had the right of entry for condition broken, has ever elected to declare the forfeiture, or made any re-entry, or done any act equivalent to a re-entry for condition broken. These plaintiffs in error are not grantees of Colehour in respect of this right of way. Whatever rights they have arise in equity, to subject this property to the payment of the mortgage debt, before that held by them is so applied. It is the well settled doctrine, that a court of equity will not lend its aid to enforce a forfeiture of a condition subsequent. Wood on Railway Law, p. 606, sec. 6.

The contention—perhaps it is better to say suggestion—of counsel, that the right of way was not properly defined by the decree, it will be presently seen, is without force. The point of difference is, that this right of way depends for its description upon the width of the right of way of the Lake Shore and Michigan Southern railway. If the latter's right of way is one hundred and fifty feet in width, the premises occupied by this railroad are, as we understand it, in accordance with the description in the deed, and the decree was correct.

In respect of the right of way of the Lake Shore and Michigan Southern Railway Company, it is insisted that it is one hundred feet wide, only, whereas the claim of the railway company, sustained by the decree, is for a width of one hundred and fifty feet. The common source of title of all these parties is admitted. It appears that in 1851 William G. and George W. Ewing, (the common source of title,) for a valuable consideration, conveyed to Norman B. Judd, "for the purpose of building, constructing, maintaining and using thereon a

railroad," a strip of land "one hundred and fifty feet wide, being seventy-five feet on each side of the following described line," (describing it,) and which extends through the mortgaged premises, and is the same strip of land here claimed by the railway company, but which grant contained the words, "that if the said railroad shall not be commenced by said party of the second part, or his heirs, over and through said premises within one year and completed within three years, * * * then and in that case the land hereby granted shall revert to the said grantors, their heirs or assigns." Judd conveyed, by deed to the Northern Indiana and Chicago Railroad Company, (of which corporation the Lake Shore and Michigan Southern Railway Company is conceded to be the legal successor,) a strip of land "one hundred feet in width, being fifty feet on each side of the following described line," describing the same line described in the Ewing deed, but following the description with the words, "hereby intending to convey all the interest vested in said party of the first part by conveyance executed by the following named persons,"—giving the names of a large number of grantors, among whom were the Ewings; with *habendum,* "to have and to hold the said premises to the said party of the second part, its successors and assigns, for the sole use and purpose of building, constructing, maintaining and using thereon a railroad, and for no other purpose whatever."

It is not questioned but that the railroad was commenced and completed within the time specified in the Ewing deed to Judd, but it is contended, first, that Judd conveyed to the railroad company a strip only one hundred feet in width; and second, that if the effect of his deed was to convey a strip one hundred and fifty feet wide, the railroad company has not used more than one hundred feet,—the two twenty-five foot strips on either side and outside the centre one hundred feet having been fenced out and abandoned, and so reverted to the original grantors.

The declared purpose of the conveyance from the Ewings to Judd was, the "building, constructing, maintaining and using thereon a railroad;" and Judd's action in at once conveying this right of way, along with many others acquired by him for the same purpose, to the railroad company complying with the condition by constructing thereon and using the premises so conveyed for a railroad right of way, would seem to conclusively show that Judd was acting for the railroad company in securing a right of way, and took and held the title to the several strips so conveyed to him, in trust for his principal. In the acquisition of this title it seems clear he was not acting for himself; and that he intended to divest himself of all the right and title so acquired, is manifest from the language employed in his deed to the railroad company. True, he specifically describes a strip only one hundred feet wide; but in the same instrument he declares his intention "to convey all the interest vested in" him by the conveyance the Ewings had previously made to him. The description of the premises in the deed, and the declared intention of the grantor, manifested by specific reference to another instrument conveying by a more extended description the same and still other strips of land, are, to the extent of the additional strips, not coincident, and the question is, which of these two descriptions must control.

The rule undoubtedly is, "that where there is a doubt as to the construction of a deed, it shall be taken most favorably for the grantee." Hence it is said: "If there are two descriptions in a deed of the land conveyed, and they do not coincide, the grantee is at liberty to elect that which is most favorable to him." *Sharp* v. *Thompson*, 100 Ill. 447, and cases cited. See, also, *Marshall* v. *Miles*, 8 Conn. 369; *Carroll* v. *Norwood*, 5 H. & J. 163; *Johnson* v. *McMillan*, 1 Strob. (23 S. C.) 143. The claim of the railroad company, here, is not, by a description in a reference deed, to exclude a part of the premises particularly described, but that by such reference additional

land was conveyed,—and such seems to be its effect. (*Coogan* v. *Burling*, 124 Mass. 393.) So, too, where the particular description was defective, effect was given to the general description. (*Haley* v. *Amestoy*, 44 Cal. 132.) And where there was repugnance between the particular and the general description, the latter was accepted. (*Ousby* v. *Jones*, 73 N. Y. 621.) And where the particular description was repugnant to the reference description, and where, as here, each description was certain, definite and complete when standing alone, the description by reference to a prior recorded deed was accepted. (*Wuesthoff* v. *Seymour*, 22 N. J. Eq. 66.) The intention of the grantor, Judd, being thus clearly shown, and the description of the premises intended to be conveyed being certain, definite and complete, that construction must be adopted which is most favorable to the grantee. It therefore follows, that by the deed from Judd the railroad company took title to the strip of land through these mortgaged premises, of the width of one hundred and fifty feet, and the decree in that regard was correct.

As respects the remaining contention, that the railroad company occupied and used no more than the centre one hundred feet of the one hundred and fifty feet conveyed, and that thereby the two twenty-five foot strips on either side of such centre one hundred feet reverted to the original grantors, the Ewings, it is to be observed that whatever may be the rights of William G. and George W. Ewing, "their heirs or assigns," in the premises, these plaintiffs in error are in no condition to take advantage of any supposed forfeiture. The condition in the deed relied on is clearly a condition subsequent, and the rule is, as before stated, that advantage thereof can only be taken by the grantor, his heirs or devisees. These plaintiffs in error are strangers to the title to this strip of land conveyed to the railroad company for a right of way, and can not be heard to complain of the action of the court in decreeing its exclusion from the operation of the Turner trust deed. It is therefore,

so far as these plaintiffs in error are concerned, wholly immaterial whether but one hundred feet—fifty feet on either side of the railroad track—was enclosed with a fence, or when the fence was built, or by whom. The railroad company undeniably entered under its conveyance, constructed its road on the premises conveyed, and has since continued using the premises for railroad purposes; and its occupation and use for this purpose, though possibly confined to a single track along and over the same, must be regarded as a possession and use for railroad purposes of the entire premises conveyed. *Hardisty* v. *Glenn*, 32 Ill. 62; *Bowman* v. *Wettig*, 39 id. 417; *Keith* v. *Keith*, 104 id. 397.

It follows, that we are of opinion that the decree should be affirmed, and it is accordingly done.

*Decree affirmed.*

Mr. JUSTICE BAILEY, having heard this case in the Appellate Court, took no part in its decision here.