EDWARD J. TURNER, trustee of the Rutherford National Bank, and the said RUTHERFORD NATIONAL BANK

*v.*

RIDGE HEIGHTS LAND COMPANY et al.

[Decided November 12th, 1920.]

Where a bank discounts a note of a corporation, and the corporation gives a mortgage on its property to an officer of the bank to secure the note and the bank afterwards knowingly accepts a note of an individual to take the place of the note originally discounted, the mortgage is extinguished.

---

On final hearing on amended bill, amended answer and counter-claim and proofs taken in open court.

*Mr. Luther Shafer* and *Mr. Albert O. Miller, Jr.,* for the complainants.

*Mr. Edward P. Johnson* and *Mr. Low* (of the New York bar), for the defendants.

STEVENSON, V. C.

This is a suit to foreclose a mortgage upon several tracts of real estate in Rutherford, New Jersey. The testimony is quite voluminous and the exhibits are numerous, presenting a somewhat complex case. This memorandum will undertake merely to state so much of the evidence as is necessary for the proper understanding of the points which are decided.

1. In the year 1907 Mr. Addison Ely was interested in a number of land companies, and, perhaps, other corporations, located at Rutherford, of all of which apparently he had the control and management. He kept accounts for these corporations with the complainant the Rutherford National Bank. While Mr. Ely seems sometimes to have used the credit of one of these companies for the benefit of another, there is nothing in the evidence which warrants the view that these corporations were not distinct entities. The defendants the Ridge Heights Land Company, the Addison-Ely Company and the Colonial Construction Company were three of these corporations which Mr. Ely controlled and managed.

On July 26th, 1907, Mr. Ely procured the Rutherford National Bank to discount a note of $4,400 for the benefit of the Addison-Ely Company, on which the Ridge Heights Land Company appears as maker, and the Addison-Ely Company appears as endorser. The Ridge Heights Land Company was in fact an accommodation maker having no interest in the proceeds of the discount, the same having been credited to the account of the Addison-Ely Company.

On the same day, and in order to secure this note, the Ridge Heights Land Company executed a bond and mortgage in the usual form for $4,400 to Andrew H. Brinkerhoff, as trustee. Mr. Brinkerhoff was at the time the cashier for the Rutherford National Bank, but there is no disclosure made in the bond or mortgage of the party for whom Mr. Brinkerhoff was acting as trustee in taking this security. It also may be noted that there was no mention made in any writing that has been produced, of any relation between the bond and mortgage to Mr. Brinkerhoff and the note for the same amount which the bank discounted as above mentioned. As a matter of fact the evidence establishes beyond question that the bond and mortgage were given to secure the payment of the note and for no other purpose. Inasmuch as the complainant the Rutherford National Bank was governed by the National Bank act, we may surmise reasons why the transactions under consideration took the form they did.

While the making of this independent bond and mortgage may have put remedies within the reach of the bank which would not

have been available if the mortgage had been given directly to the bank to secure the note, the whole transaction resulted in the common situation in equity where a mortgage or a bond and mortgage are given to secure a debt. Payment of the debt extinguishes the mortgage.

2. After this mortgage for $4,400 had been duly recorded on August 5th, 1907, a series of mortgages which some of the defendants now hold were placed upon a portion of the tracts included within the said mortgage for $4,400. At a later time Mr. Brinkerhoff assigned the bond and mortgage which he held as trustee for an undisclosed beneficiary to the complainant Mr. Edward J. Turner, as trustee also for an undisclosed beneficiary. Mr. Turner was, and is, now the president of the Rutherford National Bank. The connection between the note and the mortgage was still concealed, but the evidence shows, and the fact is not disputed, that Mr. Turner merely stepped into the place of Mr. Brinkerhoff and held the bond and mortgage for the sole benefit of the Rutherford National Bank and solely as security for the payment of the note of $4,400.

After the junior mortgages above mentioned had been made and recorded the trustee, Mr. Brinkerhoff, and later Mr. Turner, executed a series of releases whereby they discharged from the lien of their mortgage certain portions of the lands covered by their mortgage not covered by the junior mortgages.

3. The note for $4,400 originally given, as we have seen, on July 26th, 1907, was at two months, while the bond and mortgage ran for one year. The inference would seem to be that renewals of the note were contemplated, but, however that may be, in fact the note was renewed a great many times through a series of years, and partial payments upon it were made. Complainants in their bill allege that the amount due on the mortgage is $2,850. Complainants' counsel argue that this is a mistake and that the amount actually due is $3,000 and interest. The defendants say that the note, at most, if not wholly, paid stands to-day only for $1,750 and interest. I do not think that it will be necessary to consider these conflicting claims in detail.

4. On July 10th, 1911, the last renewal or partial renewal of the note for $4,400, amounting then to $3,000, fell due. The

situation of the parties with reference to this last renewal note for $3,000 was precisely the same as their situation with reference to the original note for $4,400. All the renewal notes down to this date (July 10th, 1911) were in the same form. The Addison-Ely Company was primarily liable; the Ridge Heights Land Company was secondarily liable as accommodation maker, while the land of the Ridge Heights Land Company mortgaged· to Mr. Brinkerhoff stood as collateral security for the note. When this last-mentioned note for $3,000 fell due on July 10th, 1911, the same in fact was not renewed. Mr. Ely, as the manager of both of these corporations, the Ridge Heights Land Company and the Addison-Ely Company, tendered to the bank what is on its face his individual promissory note to the Addison-Ely Company for $3,000, dated July 10th, 1911, drawn at two months and signed with his proper name, Addison Ely, and endorsed by the Addison-Ely Company, without a suggestion anywhere of the Ridge Heights Land Company. The only possible qualification of this last statement I think arises from the fact that the clerk who drew the note used the phrase "We promise" instead of "I promise." The Rutherford National Bank accepted this note in payment of the note of the Ridge Heights Land Company which they held, and thereupon surrendered the note of the Ridge Heights Land Company. The new note of Addison Ely, individually, was thereupon entered in the books of the Rutherford National Bank, and all mention of the Ridge Heights Land· Company as a party to the original note of $4,400 or any renewal or partial renewal of that note ceased to be made. The loan was carried on the note of Mr. Ely with the endorsement of the Addison-Ely Company—Mr. Ely stepping into the place of the · Ridge Heights Land Company as accommodation maker. The· note was not paid when it fell due—was protested and not renewed.

5. The defences which are set up are the following:

(1) The defendants claim that the whole mortgage debt for which the note for $4,400 and its renewals at all times stood as the primary security was fully paid when the Rutherford National Bank accepted the obligation above mentioned of Addison Ely, individually, and surrendered for cancellation the promis-

sory note upon which the Ridge Heights Land Company was only secondarily liable.

(2) The Rutherford National Bank when it gave, or caused its trustee to give, the releases above mentioned, had actual no-tice of the junior mortgages now held by the defendants, and that, therefore, according to the familiar rule in equity as between the bank and these defendants, the mortgage held by the bank must be charged with a payment to the extent of the value of the security which the bank gave up by the releases. The defendants, the junior encumbrancers, claim that the value of the released lands was far in excess of any amount which could be found due upon the mortgage of the complainant, and that, therefore, they, the defendants, the junior encumbrancers, have a right to the entire proceeds of the sale of the land covered by their mortgages until their mortgage debts are fully paid.

If this defence alone should be sustained it is probable that some adjustments would have to be made owing to the fact that the junior mortgages do not all cover the same parcels, but I do not think that this matter calls at present for investigation.

To the defences above stated the complainants reply:

(1) That the acceptance of the note of Addison Ely, indi-vidually, instead of a strict renewal note on which the Ridge Heights Land Company would stand as accommodation maker, was a mere mistake and did not accord with the intention of the parties, and that therefore they have a right to hold the bond and mortgage of the Ridge Heights Land Company as security for the land named therein, less the amount of the partial payments.

(2) That the bank had no actual notice of the junior encum-brances when the releases were made.

6. My conclusion is that the first defence must be sustained; that as the evidence stands the complainant the Rutherford Na-tional Bank must be adjudged to have knowingly accepted the in-dividual note of Addison Ely, endorsed by the Addison-Ely Com-pany, in place of the note made by the Ridge Heights Land Com-pany and endorsed by the Addison-Ely Company, and that as the result of this transaction the mortgage of the Ridge Heights Land Company covering its own lands, which stood as security for its note, was extinguished.

The conspicuous facts are—(1) that the cashier of the bank testifies that "the mortgage was given as security for a note," *i. e.*, the note of the Ridge Heights Land Company for $4,400, dated July 26th, 1907, and the defendants seem to concede that the mortgage would stand for any renewals or partial renewals of that note; (2) that Mr. Ely testifies, without contradiction, that he gave his individual note of July 10th, 1911, "to pay off" the renewal note for $3,000 of the Ridge Heights Land Company which then fell due; and (3) that this last renewal note of the Ridge Heights Land Company for $3,000 was then surrendered as a paid note and was never demanded back by the bank.

There is no credible evidence which leads to any other conclusion than that the Ely note was intentionally accepted by the bank in discharge of the note of the Ridge Heights Land Company except that which relates to the alleged mistake. The bank certainly would not have knowingly surrendered the note of the Ridge Heights Land Company if it had not been paid—if the bank still' held any claim against the Ridge Heights Land Company as accommodation maker.

The claim of the complainants that the acceptance of the individual note of Mr. Ely was a mistake on their part as well as on the part of Mr. Ely, in my opinion, is not sustained by the evidence. It is true there is some support for the surmise that a mistake was made in drawing the note by the clerk who prepared it. This clerk may have thought, and probably did think, that a renewal of the note of the Ridge Heights Land Company was to be executed, and therefore used the word "we" at the start, supposing that the rubber stamp of the company would be placed below with the line for Mr. Ely's signature as president.

The testimony of Mr. Ely, however, indicates that whatever the clerk thought who drew the body of the note and made it ready for signature, the note in fact was given instead of the note of the Ridge Heights Land Company, because it was at that time a stronger note and the bank intentionally accepted it and forthwith surrendered the note of the Ridge Heights Land Company as a paid note for cancellation. For all that Mr. Ely knows this stronger note may have been requested by the cashier of the bank. The new note—the note of Mr. Ely, individually, was duly en-

tered upon the books of the bank. Mr. Shafer testifies to state-ments made by Mr. Ely immediately before, or, what is more probable, immediately after the judgment was entered against him on the Ely note in 1913, to the effect that there had been a mistake. A very slight change of phraseology will make Mr. Shafer's testimony fully accord with that of Mr. Ely. It may be noted, however, that statements made by Mr. Ely for the purpose of extricating himself from liability and substituting the Ridge Heights Land Company, cannot be deemed evidence as against that company. Mr. Ely swears that he did not defend the suit on the note because he "supposed it [the Ely note] paid the Ridge Heights Land Company loan;" and he further testifies that in his urgent plea to the bank through Mr. Shafer he stated that the giving of his individual note instead of a note of the Ridge Heights Land Company "could be easily treated as a mistake," and he adds, "I remember that, but I do not think it was a mis-take," and he goes on to state the reasons, viz., that at the time of the transaction, July, 1911, his note was a better note than that of the Ridge Heights Land Company.

The story of this note transaction which the cashier of the bank tells is a tissue of gross inaccuracies, if not falsehoods. His tes-timony on all points in favor of the bank is utterly discredited by his failure to recollect the facts or state of facts correctly. Coun-sel for the complainants admit in their brief that the cashier "was mistaken" in regard to a most important matter. This witness represents that the substitution of the Ely note for the note of the Ridge Heights Land Company was a mistake; that he, the cashier, was not present when the note came in; that there was "absolutely no intention on anybody's part to accept anything but a note similar to what those were we had had theretofore;" that "some employe of the bank accepted" the note and there-upon "surrendered the Ridge Heights Land Company note." The witness further testifies that he found out the mistake in ten or fifteen days and took charge of the business of correcting it, and that he sent "this note [referring to the Addison Ely note] down to the Ridge Heights Land Company" objecting to the ex-change which had been made. The witness further testifies that the president of the Ridge Heights Land Company thereupon

gave another note in what he considers the "correct" form. In fact no such "correct" note was given until about two years later when the bank threatened to sue Mr. Ely, and I think had sued him, and, perhaps, had taken judgment, when Mr. Ely drew and offered to the bank the note of the Ridge Heights Land Company dated back to July 10th, 1911, and the bank refused to accept the same and surrender Mr. Ely's note. When asked why, when the witness alleged he had procured a correct note upon his discovery of the alleged mistake, Mr. Ely's note had not been surrendered, he said there was no reason whatever and that Mr. Ely might have obtained it. Thus it appears, according to the story of the cashier, that a mistake in giving the wrong note was discovered by him, a new note was demanded in the old form, such new note was promptly delivered to the bank, while Mr. Ely, or his messenger or representative, made no demand for and did not receive the old note, Mr. Ely's individual note, for which the new note of the Ridge Heights Land Company was given. As we have seen, no change of entry was made in the books, and two years later the bank put the Ely note in judgment.

According to the cashier's story the conduct of the bank in entering judgment on the Ely note on which it had no claim whatever was not "an honest mistake," as counsel for the bank now argue, but a gross fraud.

The cashier's testimony in regard to the entry of the note of July 10th, 1911, in the books of the bank is contradictory and unsatisfactory. At first he says that there was no entry made of the so-called correct note. The account book of the bank before the witness showed only the entry of the Addison Ely note—the so-called incorrect note. The witness, however, stated that there was another book not present in which there was an original entry of the note of the Ridge Heights Land Company, so that, when that note upon his demand came in, it fitted the entry which had been made and no other entry was necessary. By request the absent book in which the witness alleged the correct entry appeared was subsequently produced. It proved to be the regular discount book of the bank and there was an original entry in it under date of July 10th, 1911, of the Addison Ely note, and no entry of any note of the Ridge Heights Land Company.

The question might be raised whether the bond and mortgage to Brinkerhoff, trustee, could stand after the surrender and cancellation of the note of the Ridge Heights Land Company as security for the balance of the indebtedness for which the Addison-Ely Company was primarily liable. An arrangement made when the bond and mortgage were given, or afterwards, might have so provided, but there is no evidence that any such arrangement was made. The Ridge Heights Land Company was an accommodation maker and its collateral bond and mortgage secured its secondary liability in the absence of an express agreement otherwise. The cashier volunteers the testimony that "the mortgage was given as security for *a note.*" It follows that when the note of the Ridge Heights Land Company was paid and surrendered for cancellation the mortgage was extinguished. It is highly probable that the officers of the bank did not understand the equitable rule that a mortgage apart from the obligation which it secures is of no value. In this case the bond and mortgage in form were distinct from the note which they were intended to secure. Although the officers of the bank knew that this trustee mortgage at all times was collateral security for the payment of a note, this collateral security in form was an independent principal security and they might well have thought that they could properly continue to hold the bond and mortgage as collateral security for any number of different notes, which represented parts of the original debt, upon which notes the Ridge Heights Land Company was not liable. The slightest reflection will show how very important a matter it is to an accommodation party to a promissory note who further strengthens the note by a bond and mortgage covering his own property, to understand distinctly that although the note upon which he is secondarily liable may be paid and surrendered, his bond and mortgage—his personal obligation under seal and the mortgage of his real estate—can still be held to secure the obligations of other parties in which he is not concerned.

As to Mr. Ely's view of the status of the bond and mortgage after the note had been surrendered, we can only surmise. He was not interrogated in regard to the matter. He, too, may have overlooked the effect upon the mortgage of the payment of the

obligation which it was given to secure. Such misunderstanding on his part, if it existed, would not affect the legal or equitable rights of the Ridge Heights Land Company. If Mr. Ely shared the erroneous notion above mentioned, or in the multifarious transactions in mortgages and notes and corporations, in which he seems to have been engaged, neglected to procure for the Ridge Heights Land Company its bond and mortgage for cancellation, the continued possession of that bond and mortgage by the bank is not a circumstance taken with all the other evidence in this case which would warrant the court in inferring that there must have been an agreement by the Ridge Heights Land Company that the bond and mortgage should continue to stand as security for another note after its note had been paid.

Mr. Ely appears to have been somewhat negligent in getting the papers purporting to be obligations of himself or his companies after they had been paid or rejected, as is illustrated by his failure to demand or obtain the note of the Ridge Heights Land Company for $3,000 after the Rutherford National Bank had refused to accept that note in place of the Ely note.

We have this situation in August, 1913, when the Rutherford National Bank sued Mr. Ely and the Addison-Ely Company on the note which the cashier says was accepted in July, 1911, by mistake, and would have been surrendered to Mr. Ely if he had demanded it; the bank knew, according to its present pretence, that it had no just claim against Mr. Ely on this note, but, nevertheless, put it in judgment and refused to exchange the note for the note of the Ridge Heights Land Company, which Mr. Ely drew and dated back and which the cashier swears was the "correct" obligation which it ought to have received, and did receive, in July, 1911.

Mr. Ely, on the other hand, swears that he knew of no mistake and had no defence; he submitted to judgment after trying vainly to get the bank to accept the note of the Ridge Heights Land Company and take judgment on that note. Whether this effort of Mr. Ely was before judgment was entered or afterwards is immaterial. The important matter is, that Mr. Ely knew of no mistake in regard to the note and testifies in accordance with

all the probabilities of the case that if he had known of any mistake he would have defended the suit as best he could.

The complainant evidently thought that it was to its advantage to prosecute its action on Mr. Ely's note to judgment, although, according to its present admission, it had no just claim whatever on that note, Mr. Ely having an absolute right to the surrender of that note. When, however, it became to the advantage of the bank for the purposes of its foreclosure suit to reinstate the liability of the Ridge Heights Land Company on the note, it undertook to do so, practically admitting that it had been guilty of fraud in taking judgment against Mr. Ely. Counsel for the complainants in their brief state that the bank "made an honest mistake" in suing on the Ely note and that the bank now "offers to cancel the judgment." For blowing hot and cold, committing fraud and then offering to undo the fraud—all according to what seemed advantageous at the time—the conduct of the bank is a somewhat striking illustration.

The history of the litigations between these parties at law and in equity throws some light, I think, upon the merits of this present case.

As we have seen, the Ely note (*Exhibit D. No. 2*) on which the Ridge Heights Land Company was not a party, fell due September 10th, 1911, was protested and held without any proceedings being taken to collect it, until August, 1913, when an action was commenced thereon in which judgment was entered on October 10th, 1913. Immediately before, or immediately after this judgment was entered, Mr. Ely drew and executed as ·president the note of the Ridge Heights Land Company (*Exhibit D. No. 1*), and delivered the same, or caused the same to be delivered, to the Rutherford National Bank, and vainly sought to have that note substituted for his personal note (*Exhibit D. No. 2*) upon which the judgment had been, or was about to be, recovered. This note remained in the possession of the bank or its attorney, although, of course, it had no validity, not having been accepted. Both notes were produced by the complainants upon the defendants' call and were offered in evidence by the defendants. The complainants rested their case, I think, without voluntarily producing any evidence in regard to the existence of

either note. I think the references to these notes were brought out on cross-examination.

However this may be, the evident design of the complainants in their foreclosure suit was to ignore the notes and the judgment. The bill, as originally filed on October 11th, 1911, made Edward J. Turner, trustee, the sole complainant, not disclosing for whom he stood as trustee. The draftsman of the bill used the common form with the printed blanks for the commencement and the conclusion and made no reference either to the note or to the judgment, but treated the bond and mortgage as original, independent securities. Being compelled by a demurrer to disclose the principal an amended bill was filed November 13th, 1916, making the Rutherford National Bank the trustee's beneficiary, a co-complainant, but still ignoring the notes and making no mention in any way of the indebtedness to secure which the mortgage was merely collateral.

The answer of the defendant Ridge Heights Land Company alleges that "at the time of the execution and delivery of the bond and mortgage sought to be foreclosed by the bill of complaint herein, said Ridge Heights Land Company gave to said Andrew H. Brinkerhoff, trustee, a note for the sum of $4,400 (representing the same indebtedness mentioned in said bond and mortgage), and that subsequently payments on account" were made and renewal notes from time to time taken, and that on or about July 10th, 1911, the complainants claimed a balance of $3,000, and "that thereupon the complainants accepted in payment, satisfaction and discharge of said balance the note of Addison Ely for the sum of $3,000, payable to Addison-Ely Company and due two months from the date thereof, and endorsed by said Addison-Ely Company to the complainant Rutherford National Bank."

The answer further alleges that the note was not paid at maturity and that suit was brought and judgment entered on October 10th, 1913, for the sum of $3,437.54, "and the mortgage sought to be foreclosed by said bill was, and is, paid and satisfied."

It may be conceded that the complainants were not bound to anticipate the defence of payment which they had every reason to believe could be set up; the noticeable fact is that the com-

plainants filed a bill and then an amended bill to foreclose a mortgage without making the slightest reference to the original primary indebtedness for the payment of which their mortgage originally was a mere collateral.

7. The second defence to the claim of the bank based on the releases I think should also be sustained. The only question seems to be whether the bank had actual notice of the junior mortgages when it gave its releases. I shall not take the time to go through the testimony again in order to state all the indications that the bank had actual notice. The following now occur to me:

(*a*) The bank knew of the large operations of Mr. Ely and his corporations in real estate mortgages in Rutherford. The first release appears to have been dated August 1st, 1908, over a year after the junior mortgages had been put upon the property. The other releases were given on different dates in the year 1909.

(*b*) In July, 1908, after the mortgages, or some of them, nearly all, I think, had been given, the bank accepted another mortgage for $2,200 from the Ridge Heights Land Company upon property already covered by the mortgage for $4,400, which the bank then held, and the testimony, though not positive, indicates that a search was then made by an attorney of the bank, the result of which was communicated to the bank. The president of the bank testifies that he thinks that the bank "ran down the search to find out if there were any other liens in between"— *i. e.,* between its mortgage for $4,400 and its new mortgage for $2,200.

(*c*) The bank produces no searches. I think the intention is to have the court believe that the searches cannot be found.

(*d*) The attorneys who made the searches for the bank are not produced as witnesses, although the indications are from the testimony of the president that whatever searches were made when these mortgages were accepted were made by one of two well-known attorneys in Rutherford.

(*e*) The officers of the bank, the president and the cashier, though testifying at length in regard to the transactions in ques-

tion, including the releases, do not testify that they had no notice of any junior mortgages when releases were made.

While it must be conceded that actual notice must be proved to create the equity which the defendants claim, when we find that the matter of notice is in controversy and these officers go on the stand presumably having knowledge on the subject, and give no testimony, the usual rule of evidence seems to apply and the conclusion is warranted that the testimony which they could give would be unfavorable to their side.

It seems to me that counsel on both sides erroneously supposed that the junior encumbrancers have some equity in the money paid to the first mortgagee as the consideration of a release. No authority is cited to support such a supposed equity and I see no foundation for it. The first mortgagee may make what bargain he pleases with the mortgagor with respect to the conditions under which a release will be given. The mortgagee may exact double the value of the land released; he may take one-half. The money paid for the release and its application to the mortgage debt or any other debt is a matter purely between the mortgagor and mortgagee.

The equity of the junior encumbrancers arises from the fact that the mortgagor with his encumbrance on two parcels of land, knowing of the junior encumbrances covering only one, has knowingly and intentionally given up a security which in equity he was bound to exhaust before resorting to the other security which stood as the only security of the junior encumbrancers. Whether the mortgagor had paid double the value of the released land or only one-half such value, the equity of the junior encumbrancers is the same. According to the well-settled rule the first mortgage, after the releases, is cut down as a mortgage *prior* to the junior mortgages, to the extent of the value of the released land, and continues to stand as a mortgage subsequent to those junior encumbrances for the amount subordinated to those encumbrances, which amount the mortgagor still owes. If the first mortgage is for $5,000, and the released lands are worth $4,000, the decree gives the first mortgage priority to the extent of $1,000, then provides that the junior encumbrances shall come next, and then, last of all, if there is any surplus, it will be applied to

the payment of the $4,000 still due on the first mortgage as against the mortgagor.

8. The discussion immediately preceding disposes of the counter-claim on behalf of the junior encumbrancers which prays that the mortgage of the complainants be surrendered for cancellation. The basis of this claim seems to be that the released land far exceeded in value the utmost which could be found due upon the complainants' mortgage. This fact, however, if it be a fact, does not affect the status of the mortgage between the complainants as mortgagee and the Ridge Heights Land Company as mortgagor. It would, indeed, be a most extraordinary result of equitable principles if the mortgagee who has voluntarily released to the mortgagor lands greater in value than his mortgage debt should be obliged to release his mortgage debt to the mortgagor and cancel his mortgage. It may be in this case that if the widest claim of the defendants to priority in respect of their junior mortgages is sustained, and the sale of the property covered by their mortgages pays their mortgage debt in full, a substantial sum may be left which will be applicable to the complainants' mortgage debt which stands unpaid as against the mortgagor and as against it an encumbrance upon the unreleased land.

9. I have considered both of the defences which have been interposed, notwithstanding the fact that the first, which is the defence available to the Ridge Heights Land Company having been sustained, the result must be a dismissal of the bill.

The second defence, however, which is available to the junior encumbrancers only has been fully argued and the facts, according to the judgment of the defendants, are such that if the defence is sustained the entire amount of the junior encumbrances in question will be placed prior to the whole of the complainants' mortgage debt. It would seem in the condition of the proofs that in case the first defence should be finally overruled and the second defence sustained a reference to a master would be necessary.

It will be observed that the mortgagor, the Ridge Heights Land Company, and the junior encumbrancers unite in the counter-claim which prays for the surrender of the bond and

mortgage for cancellation. As we have seen, neither the mortgagor nor the junior encumbrancers can possibly be entitled on account of the releases to any such relief as against the complainant. The complainants' mortgage, notwithstanding the releases, stands as against the mortgagor as an encumbrance upon all the unreleased land for the full amount due thereon, while as against the junior encumbrancers it is subordinated as a lien to their mortgages to the extent of the value of the released land.

My conclusion is that the defendant the Ridge Heights Land Company is entitled to a decree sustaining its defence of payment and giving it the affirmative relief prayed for in its counterclaim, viz., the surrender of the bond and mortgage for cancellation.

Inasmuch as the matter has been tried, argued and submitted for decision, I think I may state the further conclusion that if the conclusion first above stated is to be deemed erroneous so that the complainant must be adjudged to hold its mortgage for the full amount due thereon as an encumbrance upon the unreleased land, it must be subordinated to the junior encumbrances upon that land to the extent of the value of the released land.

The final decree may be settled on notice and any unconsidered matters may then be determined.