# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-CT-00475-SCT

*BANCORPSOUTH BANK*

*v.*

*SHELBY K. BRANTLEY, JR., ROBERT CRUMPTON,*
*NORMA S. BOURDEAUX, LANGSTON OXFORD*
*PROPERTIES, L.P., SUSAN M. BRYAN, JOHN*
*ALBRITON AND LYNN ALBRITON*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 02/28/2011 |
| TRIAL JUDGE: | HON. GLENN ALDERSON |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | DANIEL MYLES MARTIN |
| | JOHN J. CROW, JR. |
| | AUSTIN GARRETT GRAY |
| ATTORNEYS FOR APPELLEES: | SHANE F. LANGSTON |
| | REBECCA M. LANGSTON |
| | G. TODD BURWELL |
| | DANA E. KELLY |
| | JACQUELINE H. RAY |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART.  THE JUDGMENT OF THE CHANCERY COURT OF LAFAYETTE COUNTY IS REVERSED AND THE CASE IS REMANDED - 03/20/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. BancorpSouth Bank filed a complaint for declaratory judgment, judicial foreclosure, and other relief against Van Buren Group, LLC, a corporation that organized the construction of thirty condominiums in Oxford. BancorpSouth also named several members of Van Buren Group and several condominium purchasers. Four purchasers and two members moved for summary judgment, which the chancellor granted.[1] The Court of Appeals affirmed the grant of summary judgment as to the four purchasers; however, it reversed and remanded as to the two members. We granted BancorpSouth's subsequent petition for writ of certiorari. We hold that an issue of material fact exists, reverse the chancery court's grant of summary judgment as to the four purchasers, and remand the case.

## FACTS AND PROCEDURAL HISTORY

¶2. In March 2001, H. Claiborne Frazier formed Van Buren Group, LLC ("Van Buren") with plans to purchase a piece of real estate in Oxford, Mississippi, and build and sell thirty condominiums. Frazier applied for financing with BancorpSouth, and, on August 20, 2001, through loan officer Bobby Little, BancorpSouth issued a commitment letter to Van Buren for a $5,400,000 loan. The loan commitment required Van Buren to "present evidence on the sale of 18 units through sales contracts and the collection of earnest money equal to 10% of the sales price." Should eighteen units not be presold, the loan commitment provided that letters of credit on the difference between eighteen and the number of units actually presold would be accepted, subject to BancorpSouth's approval.

---

[1]The court entered an order pursuant to Mississippi Rule of Civil Procedure 54(b) for the purpose of appeal, deeming the summary judgment a final judgment against the parties to the motion. *See* Miss. R. Civ. P. 54(b).

¶3.    On August 22, 2001, James Irby of Irby & Associates, Inc., who had been retained to appraise the condominiums, sent a letter to Little at BancorpSouth. The appraisal letter listed all the units, the appraised value, the listed sales price, and the sales status of each unit. The appraisal letter listed units 102, 210, and 303 as "Sold" and unit 306 as "Pending," however, it did not provide the names of the purchasers. A day later, on August 23, 2001, Bobby Covington of Taylor Covington & Smith, P.A. ("TCS") and attorney for Van Buren, wrote a letter to Little and BancorpSouth, certifying that nineteen units had been presold and that he was holding deposits for the units in his escrow account. The certification letter identified future purchasers as: John and Lynn Albriton, Shane Langston, James B. Grenfell, and Tim Ford. The Albritons, Langston, and Grenfell together with Larry and Susan Bryan and Norma Bourdeaux are referred to hereinafter as "the purchasers."

¶4.    On September 5, 2001, Van Buren executed a promissory note in the amount of $5,400,000 in favor of BancorpSouth along with a deed of trust conveying a secured interest on the property to BancorpSouth. As to the promissory note, Frazier signed a personal guaranty. Two Van Buren members, hereinafter the "guarantors," also signed the guaranty – Robert Crumpton and Shelby K. Brantley, Jr. The deed of trust was recorded in the Office of the Chancery Clerk of Lafayette County on September 12, 2001.

¶5.    As reflected in the August 23, 2001, letter, Van Buren had presold several units – including those of the Albritons, Langston, and Grenfell – before entering the loan agreement. The Albritons executed a contract to purchase unit 303 on May 30, 2001, for $241,980. The agreement provided, in paragraph thirteen, that it was "subject and subordinate to the lien of any construction mortgage now or hereafter placed on the Unit, but

3

the Seller shall cause such mortgage to be discharged or the above-described unit released of record prior to or simultaneously with the date of delivery of the Warranty Deed." Further actions concerning the Albritons' sale did not take place until 2003.

¶6.     On June 21, 2001, Shane Langston executed a Reservation Agreement with Van Buren to reserve his right to purchase unit 102. Ten days earlier, Langston issued a check payable to TCS, representing the reservation fee. Soon after, on June 25, 2001, Langston entered a Purchase Agreement, which was substantially similar to that entered into by the Albritons, including paragraph thirteen. Per the Agreement, Langston would pay a total of $241,980 to TCS, as the escrow agent, with an earnest money deposit of $24,198, also paid to TCS. Further actions concerning Langston's sale did not take place until 2003.

¶7.     On July 8, 2002, Susan Bryan executed a Purchase Agreement in which she agreed to purchase unit 207 for $259,000. The Agreement was substantially the same as that entered into by the Albritons, including the clause that Van Buren should discharge the mortgage on or before the date of delivery of the Warranty Deed and that time was of the essence. Two days later, on July 10, 2002, Larry Bryan subsequently issued a check to TCS in the amount of $24,900 as earnest money.

¶8.     Also in July 2002, Frazier Construction and Development, Inc., sent a letter to BancorpSouth that appears to list the units sold to date, the respective buyers, and the contracted purchase prices. Of note, the letter lists "102 Shane Langston - $241,980. . . 207 Bryan - $259,000 . . . 210 Tim Ford - $210,000. . . 303 John Albritton - $241,980. . . 305/306 Lee - $400,000." A handwritten note at the bottom of the letter totals the purchase prices to $5,306,900, which was approximately the amount of the BancorpSouth loan.

4

¶9.    On November 20, 2002, Norma Bourdeaux issued a check for $1,000, payable to TCS, as a deposit for the purchase of unit 111. On January 22, 2003, Bourdeaux signed a Purchase Agreement for unit 111, agreeing to purchase it for $190,000. Several pages of the Agreement are absent from the record; however, it appears that it was substantially the same as that signed by the Albritons. The Agreement provided that the purchase money would be paid to TCS as the escrow agent. On the same day, Frazier offered Bourdeaux an $8,000 discount for early payment of the remaining purchase money, or $181,000 with the discount. Bourdeaux delivered a check to Van Buren for $181,000 on January 22, 2003. When asked why she made the check out to Van Buren and not TCS, as stipulated, Bourdeaux stated that it was probably because Frazier asked her to do so. Bourdeaux's unit was substantially complete by the summer of 2003. However, Van Buren did not execute and file the Warranty Deed until September 2005.

¶10.    Sometime after entering their Purchase Agreement, the Albritons were approached by Frazier, offering a $5,000 discount in exchange for an early closing. On February 26, 2003, the Albritons entered a settlement agreement reflecting the discount, and the sale was closed at the office of TCS. The settlement agreement shows that the Albritons paid $236,980 to Van Buren and gave Frazier $13,438.20 in store credit at the Albritons' jewelry store. A Warranty Deed was executed and delivered soon after closing in February 2003; however, the deed was not recorded until November 21, 2007.

¶11.    On May 13, 2003, Van Buren and the Bryans amended their Purchase Agreement, providing the Bryans a $5,000 discount in exchange for their early payment to TCS as escrow agents of $228,100, increasing the total amount in escrow to $254,000. The discount

5

was provided so that Van Buren would be able to pay down the loan sooner. Although the amended agreement provided that the funds would be paid into escrow, on May 13, 2003, Larry Bryan made a check directly to Van Buren in the amount of $228,100. On July 13, 2003, TCS sent Susan Bryan a Certificate of Title, which referenced the security interest held by BancorpSouth. Van Buren delivered a Warranty Deed to Susan Bryan on September 3, 2003, and the deed was recorded on October 13, 2003.

¶12. Langston closed on unit 102 on August 18, 2003, paying Van Buren $220,565. In return, Van Buren provided Langston with a Warranty Deed the same day, but it was not recorded until August 12, 2005. The deed was titled to "Langston Oxford Properties, LP," an entity Langston created to handle the closing. Prior to closing, on July 31, 2003, Langston entered a Settlement Agreement with Van Buren, which indicated that $255,621 of the purchase price was for "Payoff of first mortgage loan" with BancorpSouth. The Albritons, Bryans, Langston, and Bourdeaux all took possession of their respective units between June 2003 and November 2003.

¶13. An internal BancorpSouth memorandum was sent by Ronald Winford, who succeeded Bobby Little in overseeing the Van Buren loan, to James Stringer in the Credit Administration Department on June 2, 2003. The memo recapped a meeting between Winford and Stringer, accompanied by Ron Hendrix and the Fraziers on March 27, 2003. The memo lists the loan to Van Buren, stating that the $5.4 million loan had been advanced $5,311,885 to date and that the project was "91% complete with 27 of 30 units sold." It also states that Covington "is preparing Deed of Trust release documents for us to review in

6

anticipation of condo closing in mid-June," and that Winford anticipated "being paid out of this project by the end of August."

¶14.   As previously mentioned, Tim Ford was listed in the August 23, 2001, letter from Covington to BancorpSouth as having contracted with Van Buren for the purchase of unit 210 and having deposited $21,000 in escrow with TCS.  According to a BancorpSouth document, Van Buren executed a deed to Ford on September 26, 2003, and BancorpSouth executed a partial release of that unit on October 9, 2003.  BancorpSouth had not been remitted the proceeds from the sale.  Winford testified that the release of Ford's condo was a mistake because Ford's condo closed the "same day" as unit 202, the sales of which were remitted to BancorpSouth on September 19, 2003.  However, Ford's condo actually closed nine days after unit 202.  BancorpSouth's partial release list, date unknown, shows that unit 202 was not released from the deed of trust, although Ford's was released.

¶15.   The August 22, 2001, appraisal letter listed unit 306, eventually purchased by Lee, as pending.  Further, the July 2002 letter sent by Frazier Construction & Development, Inc., to BancorpSouth included "305/306 Lee $400,000."  Lee received a Warranty Deed as to units 305 and 306 on February 19, 2004, and the deed was filed February 23, 2004.  Lee had paid $399,000 to Van Buren; however, the sum was never remitted to BancorpSouth.  His deed, like those of the four purchasers, showed no encumbrance by BancorpSouth.  Around the same time, Lee decided to purchase a third unit.  In his title work relating to the third unit, Lee discovered that his first two condos had not been released from the BancorpSouth Deed of Trust.  On April 13, 2004, Lee sent a letter to Frazier demanding an immediate release of his condos.  Frazier faxed Lee's demand letter to Winford along with a letter stating that the

7

release would be imminent. Lee's first two condos were released soon after, on May 19, 2004.

¶16. Lee still owed $50,000 on his third condo, unit 307, but would not release the final payment until BancorpSouth executed a partial release of that unit. On June 22, 2004, Lee sent a letter to Frazier indicating that Frazier had breached the Purchase Agreement and that he had a general suspicion of criminal conduct. On that same day, Lee visited Dave Bush, senior vice-president at BancorpSouth, and alerted Bush that the money he had paid to Van Buren had not been tendered to BancorpSouth. Bush immediately spoke with Winford and instructed Lee to take the check for $50,000 to Winford in Madison, Mississippi, and that he would deliver a partial release to Lee. Lee did that, and his third unit was released from the mortgage on June 23, 2004. At his deposition, Winford could not recall that Lee had requested a release of his units, nor did he recall meeting with Lee.

¶17. Van Buren remitted the purchase money to BancorpSouth for twenty-one of the units sold, which the bank accordingly credited to the Van Buren loan and subsequently executed partial releases of the deed of trust for the respective units. However, at some point in time, the bank discovered that Van Buren had sold five units – the purchasers' units – without remitting the money to the bank. Having not received the money and not knowing that those five units had sold, the bank did not release the purchasers' units from the deed of trust. Van Buren defaulted on its loan, and BancorpSouth initiated foreclosure proceedings against the purchasers. In essence, the purchasers argue that, because BancorpSouth, knowing that units had been previously conveyed to the purchasers, released Ford's and Lee's units without respectively crediting the Van Buren loan, the bank should not be able to proceed with

8

foreclosure against the purchasers until the bank credited the loan as to Ford's and Lee's units. The purchasers argue that, because the amount outstanding on the loan was less than the value of Ford's and Lee's units, the loan would be fully satisfied, and the bank could not foreclose on the purchasers' units.

¶18. In October 2007, BancorpSouth filed a complaint for declaratory judgment, judicial foreclosure, and other relief in the Lafayette County Chancery Court against the Van Buren Group and its members: Claiborne Frazier, Austin Frazier, C.E. Frazier, Shelby Brantley Jr., and Robert Crumpton. It also named five condo purchasers: Norma Bourdeaux, Langston Oxford Properties, L.P., Susan Bryan, Lynn Grenfell, and John and Lynn Albriton. Grenfell was dismissed by agreed order. The remaining four purchasers moved for summary judgment, which Brantley and Crumpton separately joined.

¶19. As of March 5, 2004, the outstanding balance on the Van Buren loan was $1,530,763.80. BancorpSouth later received $1,068,287.30 in payments toward the balance. The purchasers argued that BancorpSouth improperly released the four units sold to Lee and Ford, which, minus the $50,000 payment by Lee, amounted to $869,000. When this amount is added to the payments already received, the sum is greater than the total amount of the loan; therefore, no debt was secured by the four purchasers' units, and judicial foreclosure was improper. The four purchasers also alleged that BancorpSouth was aware through Winford that Van Buren had sold the five units out of trust and did not notify the purchasers. Further, they alleged that BancorpSouth's dealings with Lee and Ford demonstrated unclean hands. On February 28, 2011, the chancery court granted summary judgment in favor of

9

Brantley, Crumpton, and the four purchasers. BancorpSouth appealed the chancery court's grant of summary judgment.

¶20. The Court of Appeals affirmed as to the four purchasers but reversed and remanded as to Brantley and Crumpton, finding that a genuine issue of material fact existed as to whether BancorpSouth received full payment of the amount owed based on the funds received from the units sold. *BancorpSouth Bank v. Brantley*, 2012 WL 6118137 (Miss. Dec. 12, 2013). Following the decision of the Court of Appeals, BancorpSouth settled its claims against the guarantors. BancorpSouth filed a petition for writ of certiorari, which we granted to clarify the correct application of what we refer to below as the *Pongetti* rule.

## DISCUSSION

¶21. Under Mississippi Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). A trial court's grant or denial of a motion for summary judgment is reviewed under a *de novo* standard. *Poppenheimer v. Estate of Coyle*, 98 So. 3d 1059, 1062 (¶ 7) (Miss. 2012) (citing *Whitaker v. Limeco Corp.*, 32 So. 3d 429, 433-34 (¶ 10) (Miss. 2010)). In reviewing a trial court's grant of summary judgment, the Court views the evidence "in the light most favorable to the party against whom the motion has been made." *Pratt v. Gulfport-Biloxi Reg'l Airport Auth.*, 97 So. 3d 68, 71 (¶ 5) (Miss. 2012). Where doubt exists as to whether a genuine issue of material fact exists, courts should err on the side

10

of denying summary judgment. ***Todd v. First Baptist Church of West Point***, 992 So. 2d 827, 829 (¶ 9) (Miss. 2008).

**Whether the grant of summary judgment was appropriate.**

*A. The* **Pongetti** *Rule*

¶22.   Mississippi has long followed the doctrine of inverse alienation in situations in which "a judgment debtor has various pieces of property, affected by the judgment lien[;] if he alienate[s] one piece, that [piece] is not to be charged, until the others, not alienated, have been subjected [to the judgment lien], provided they still remain within reach of the execution." ***Agric. Bank of Miss. v. Pallen***, 16 Miss. 357, 359 (8 S. & M. 357) (1847).  In such situations, "If all be alienated, then each is liable to the satisfaction of the judgment, in the inverse order of alienation; the last alienated being first liable." ***Id.***  The rule of inverse alienation has been reaffirmed most recently by the Court in ***Pongetti v. Bankers Trust Savings & Loan Association***, 368 So. 2d 819 (Miss. 1979).  The doctrine of inverse alienation applies to the facts of the case *sub judice*.  If all subdivided parcels of a tract of land "be necessary to satisfy the judgment, then all must be so applied.  It is a question only as to the order of application." ***Id.*** (citing ***Pallen***, 16 Miss. at 359).

¶23.   While the doctrine of inverse alienation is itself straightforward, the situation is complicated when, as here, the debtor first alienates parcels of property, which the mortgagee does *not* release from the lien, and the debtor subsequently conveys other parcels, which the mortgagee *does* release from the lien.  The ***Pongetti*** Court wrote, in pertinent part,  as follows:

11

It is the general rule, subject to certain qualifications set out in succeeding subdivisions, that where a mortgagor or other lienee has alienated a portion of the mortgaged premises, and the mortgagee or other lienor, *having notice of such alienation*, releases the mortgage or other lien as to the portion retained by the mortgagor or lienee, such mortgagee or lienor must deduct from the debt, before enforcing his lien against the property alienated, the value of the property released.

*Pongetti*, 368 So. 2d at 823 (quoting 110 A.L.R. 67 (1937)) (emphasis added). The above-quoted language, not the doctrine of inverse alienation established well before *Pongetti*, constitutes the *Pongetti* rule. Stated differently, a mortgagee such as BancorpSouth may release whatever parcel of land it wishes from a mortgage that covers multiple parcels. However, when a mortgagee does so with notice that other parcels were alienated prior to the released parcels, then it does so at its own risk. Should foreclosure occur, the mortgagee must count the value of the released parcels against the total remaining debt.

¶24. The reason for the *Pongetti* rule, as we call it herein, is simple. As discussed above, the doctrine of inverse alienation has long been the law in Mississippi. People who purchase parcels of real property that have been subdivided from a larger parcel subject to one overarching mortgage have the right to expect the law to be followed should the mortgagee commence foreclosure proceedings. Allowing the mortgagee to release later-alienated parcels without consideration and with notice of the earlier-alienated properties inequitably takes away the quite-justified expectation of the earlier purchasers. *Ridge of Brooklyn Realty Co. v. Offerman*, 149 A.D. 878, 134 N.Y.S. 788 (N.Y. App. Div. 1912) ("The enforcement of the rule is never permitted to interfere with the legal rights of the mortgagee, but at the most it controls the method or order in which his rights may be enforced, and

12

forbids him to wantonly disregard the equitable rights of others of which he has knowledge.").

¶25.    In *Pongetti*, Mississippi Valley Title Insurance Company held a senior mortgage on a piece of property divided into Tract I and II. *Pongetti*, 368 at 820. Sims held a junior mortgage as to only Tract I. *Id.* Without receiving any payment on the mortgage, Mississippi Valley released Tract II and began foreclosure against the part of Tract I covered by Sims's mortgage. *Id.* Sims sought to enjoin Mississippi Valley from selling that part of Tract I covered by his deed of trust. *Id.* Sims asked that any proceeds from a sale be applied first to satisfy his deed of trust plus his damages. *Id.* at 820-21. The Court, applying the rule quoted above, found that Sims "had a right to require Mississippi Valley, as holder of the senior mortgage covering both Tract I and Tract II, not to release its security on Tract II without crediting the value of Tract II on its senior mortgage." *Id.* at 823-24. The Court went on to find that, as to Sims, Mississippi Valley's senior mortgage was discharged because the value of the land released without consideration satisfied its mortgage. *Pongetti*, 368 So. 2d at 824.

¶26.    In the instant case, BancorpSouth released from its mortgage four units sold to John Lee and Tim Ford for little or no consideration after the sales to the four unit purchasers. On October 9, 2003, BancorpSouth released Ford's unit 210 for no consideration, and on May 19, 2004, the bank released Lee's units 305 and 306, also for no consideration. After sending a letter to Frazier and personally talking to a vice-president of BancorpSouth, Lee obtained a release on his third unit in exchange for $50,000 paid to the bank, despite the unit being purchased for a total of $300,000. Added together, the amount of money that should have

13

been remitted to the bank from the sales of these units totaled $869,000, which does not include the $50,000 that Lee in fact paid the bank.

¶27.    According to BancorpSouth's documents, the Van Buren loan had an outstanding balance of $1,530,763.80 as of January 23, 2004.  From January 23, 2004, to March 31, 2008, the bank received payments totaling $718,213.66.  The four purchasers would add approximately $300,000 to that total, according to their Motion for Summary Judgment, which would account for the March 11, 2008, foreclosure of unit 309.  However, the foreclosure amount for unit 309 is unclear.  BancorpSouth's documents indicate a payment of $45,000 on March 31, 2008, which may have been for the foreclosure of unit 309, but this is unknown.

¶28.    Thus, BancorpSouth actually received $718,213.66 between June 23, 2004, and March 31, 2008.  Were we to apply the *Pongetti* rule, we would then add the $869,000 that should have been remitted to the bank when it released the deeds of trust on Lee's and Ford's units, bringing the total to $1,587,213.66, an amount more than the $1,530,763.80 due on the Van Buren loan as of January 23, 2004.  Accordingly, if the *Pongetti* rule applies, the Van Buren debt was fully satisfied by the *Pongetti* credit for the Ford and Lee units.[2]

**B. Whether Pongetti *requires actual or constructive notice of the earlier alienations to apply.***

---

[2]In its brief, BancorpSouth contends that other costs, such as legal fees, would drive the total amount due under the mortgage higher such that additional foreclosures would be necessary.  Although we do not reach the argument, we note that the trial court will have to determine what, if any, additional amounts should be added to the total debt.

14

¶29.    BancorpSouth argues that for the ***Pongetti*** rule to be applicable, it must be shown that the bank had actual notice of the earlier alienations to the purchasers. The four purchasers argue that ***Pongetti*** does not require actual notice. The Court of Appeals did not expressly answer what type of notice was required, finding the argument moot, as BancorpSouth had received actual notice. ***BancorpSouth***, 2012 WL 6118137, at *3 (¶ 13).

¶30.    Before addressing whether the law requires actual or constructive notice, we must first determine of what, exactly, BancorpSouth would need to have notice for the ***Pongetti*** rule to apply. The bank contends that, in order for the rule to apply, it must have notice that the purchasers had bought their units at the time the bank released the later-purchased Ford and Lee units from the mortgage. The purchasers, without citation to authority, argue that the pertinent event, of which notice was required, was that the bank had released the Ford and Lee units, even though it had not received the purchase funds from Van Buren. We need look no further than the ***Pongetti*** Court's opinion to determine that BancorpSouth's interpretation is correct. In the above-quoted section from ***Pongetti***, in which the Court quoted and relied upon 110 *American Law Reports* 67 (1937), the rule requires the mortgagee to have notice of the alienation of part of the mortgaged tract by the mortgagor to trigger the ***Pongetti*** rule as to the remaining part of the tract, still held by the mortgagor, should the bank release that remaining, nonalienated part from the mortgage.

¶31.    The result jibes well with the doctrine of inverse alienation. The purpose of the doctrine of inverse alienation, put simply, is protection.

> In so far as the inverse order of alienation doctrine requires that the land retained by the lienee must first be sold to pay the paramount encumbrance, before the land aliened by him may be reached, it seems to be based on the

> fundamental notion of equity that in the absence of a contract or intention indicating to the contrary, one man's property may not be used to pay the debts of another; and that an owner of land subject to a paramount encumbrance, who encumbers or alienates a part, retaining the other part, who does not expressly charge the parcel encumbered or aliened with the payment of the paramount encumbrance, must be presumed to have intended or agreed that the encumbrance should be discharged out of the part remaining in his hands, and that the parcel aliened or encumbered should be free from the burden of the paramount encumbrance, particularly where he conveys the part with covenants of warranty against encumbrances, and receives full value for the part aliened.

P.H. Vartanian, *Sale in Inverse Order of Alienation*, 131 A.L.R. 4 (1941). "The right to have the lien satisfied by this method is an equity which each grantee has against the original owner and against all subsequent grantees." *Doctrine of Inverse Order of Alienation as Affected by Release of Part of Property Covered by Mortgage or Other Lien*, 110 A.L.R. 65 (1937). Without any release by the bank of any part of the mortgaged property, after the mortgagee alienates part of the property, the portion alienated goes to the back of the line, so to speak, for purposes of collection should foreclosure occur. The bank would be required first to execute upon the part still held by the mortgagee, and – only then – proceed against the parts alienated, now in the hands of a third person. If more than one conveyance were made to more than one third person, then the bank would be able to execute against the multiple parcels in the reverse order of alienation but – again – only after executing against the nonalienated portion. Accordingly, something of a equitable hierarchy emerges for the purpose of determining whose property is at risk first in foreclosure. For example, the proper treatment of the instant case would be straightforward absent the release of the Ford and Lee units from the mortgage. The purchase agreements signed by the purchasers stated that the units were subject to the lien of a construction mortgage. The eight units would have been

16

subject to foreclosure, with the latest-purchased unit the first to be at risk, then the next-latest-purchased unit, and so on, until the mortgage was satisfied or the property available to foreclose upon was exhausted.

¶32.    In the situation here, eight units – all alienated by the mortgagor – are extant in foreclosure, but the four later-alienated units, which normally would be the first four subject to foreclosure, have been released by the bank from the mortgage.  If the bank released the four later-alienated units with knowledge that four other units, bought by purchasers with the expectation that the remaining units would be foreclosed first, had already been alienated, it makes perfect sense to hold that the bank, so knowing, released the later-alienated units at its own risk.  However, if the bank released the later-alienated units without knowledge that four units had previously been alienated – in other words, believing additional units remained in the hands of the mortgagor that would be available for foreclosure – then no reason exists to penalize the bank for releasing whomever it will from a mortgage.

> Where, however, it appears that the mortgagee had no notice of a prior conveyance or conveyances at the time when he released a parcel of the mortgaged premises alienated by the mortgagor, it is uniformly held that he may enforce his lien against the parcel or parcels first conveyed, to the full extent of the debt secured.

*Doctrine of Inverse Order of Alienation as Affected by Release of Part of Property Covered by Mortgage or Other Lien*, 110 A.L.R. 65 (1937).  Accordingly, we hold that the event of which a mortgagee must be on notice is the earlier alienation of parcels of the mortgaged land at the time it chooses to release later-alienated parcels (or units, as in the case *sub judice*).  Having identified the notice event, we now turn to the type of notice required–actual or constructive.

17

¶33.     As discussed above, the ***Pongetti*** Court adopted the *American Law Reports* article's discussion of the effect of a release on part of a larger tract of mortgaged land.  The language so adopted provides, in pertinent part, that "the mortgagee or other lienor, *having notice of such alienation*, releases the mortgage or other lien as to the portion retained by the mortgagor or lienee. . . ."  While the quoted language should not be taken as dispositive, as the parties did not place the type of notice required at issue in ***Pongetti***, it is worth noting that the language contains none of the usual markers to indicate that something less than actual notice is acceptable, such as "reasonably should have known" or the like.

¶34.     Because the ***Pongetti*** Court's language does not wholly answer the question, the Court turns to decisions by other courts as persuasive authority.  In a case analogous to ***Pongetti***, the Fourth Circuit wrote:

> Where the owner of the paramount incumbrance [sic] releases security therefrom, there is ordinarily nothing to put him on notice that the owner of the property incumbered has conveyed any part of it, and he is not chargeable with notice of such conveyance unless it is *expressly brought to his attention*.

***Fidelity & Cas. Co. of N.Y. v. Mass. Mut. Life Ins. Co.***, 74 F.2d 881, 885 (4th Cir. 1935) (emphasis added).  However, that court went on to say that if the owner of the paramount encumbrance "is diligent and investigates the holdings of the grantor and the incumbrances [sic] against them, as he should do in the exercise of ordinary care, he will learn of prior conveyances which are of record and the equities of prior alienees."  ***Id.***  The court found that it was reasonable to hold that

> the surety on such a bond, given to protect against the enforcement of a lien, is chargeable with notice of what the records disclose as to prior conveyances by the grantor of property subject to that lien.  He is fairly put upon inquiry by

18

the circumstances and is chargeable with knowledge of what the inquiry would have disclosed.

*Id.* at 885-86. Thus, the Fourth Circuit merely requires inquiry notice for the ***Pongetti*** principle to apply.

¶35. In contrast, the Tenth Circuit has required actual notice, holding that "if the senior mortgagee, with actual knowledge of the junior encumbrance voluntarily releases a portion of its security to the prejudice of the junior encumbrancer, without releasing a proportionate part of its debt, it is accountable to the junior encumbrancer for the value of the released security." ***Cont'l Supply Co. v. Marshall***, 152 F.2d 300, 308 (10th Cir. 1945) (citing ***Turner v. Ridge Heights Land Co.***, 92 N.J. Eq. 64, 111 A. 675 (N.J. Ch. 1920); ***Anderson v. McCloud-Love Live-Stock Comm'n Co.***, 58 Neb. 670, 79 N.W. 613 (1899); ***Howard v. Burns***, 73 Minn. 356, 76 N.W. 202 (1898); ***Boone v. Clark***, 129 Ill. 466, 21 N.E. 850 (1889)). The Third Circuit quoted the above language with apparent approval in ***In re Penn Central Transportation Co.***, 494 F.2d 270, 277 (3d Cir. 1974). The Supreme Court of Alabama has similarly required actual notice. ***Interstate Land & Inv. Co. v. Logan***, 196 Ala. 196, 206, 72 So. 36, 40 (1916) ("The mortgagee is not prevented from dealing with the mortgaged premises in any manner consistent with his general rights as a mortgagee, unless he has received actual notice of the conveyance to the subsequent owners whose interest would be affected by his dealings.").

¶36. The Court holds that actual notice is required to trigger the ***Pongetti*** rule. Requiring actual notice aligns with the intention of ***Pongetti*** that mortgagees, such as BancorpSouth, cannot release a partial deed of trust on a parcel – here the Ford and Lee units – when they

19

expressly knew that other parcels had been previously conveyed but not released – here the purchasers' units – without subsequently deducting the value of the parcel from the overall lien. In other words, the intention of the rule of inverse alienation is fulfilled under *Pongetti* in that, upon foreclosure, the mortgagee must first foreclose on the parcels most recently alienated and cannot release recently alienated parcels without crediting the earlier alienated parcels, if actually known by the mortgagee, for the value of the parcels released.

¶37. The Court has defined what constitutes actual notice:

> actual notice often means knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably prudent persons to investigate and ascertain as to the ultimate facts, and it may include knowledge of all facts which a reasonable inquiry would have disclosed. Actual notice is implied only when the known facts are sufficiently specific to impose the duty to investigate further and when such facts furnish a natural clue to the ultimate fact. Implied notice arises from an inference of fact.

*AmSouth Bank v. Gupta*, 838 So. 2d 205, 215 (¶ 27) (Miss. 2002) (quoting *King Lumber Indus. v. Cain*, 209 So. 2d 844, 848 (Miss. 1968)). With that said, the *AmSouth* Court went on to find that "[m]erely alleging what Farmer knew or should have known sometime over the course of one month, in a case where specific dates are crucial, will not support a finding that AmSouth actually was on notice . . . ." *Id.* at 215-16 (¶ 29). Similarly, the Court cannot find that the purchasers have demonstrated that BancorpSouth actually knew that they specifically had been conveyed their units. Instead, the purchasers merely allege that the bank knew of their conveyances through documents that do not make specific reference to the purchasers' conveyances. Taking the evidence in the light most favorable to BancorpSouth as the nonmoving party, the Court finds that an issue of material fact exists as to whether BancorpSouth had actual notice of the purchasers' conveyances.

20

¶38. To summarize, it is the *actual* notice of the alienation of the unreleased portions, i.e., the purchasers' units, that is of concern, not the alienation of the released portions. Whether the ***Pongetti*** rule is in play hinges on whether BancorpSouth, as mortgagee, knew that units had been conveyed to the purchasers when the bank released the Ford and Lee units from the deed of trust.

¶39. A list showing the dates of the partial releases shows that Ford's unit 210 was released on October 9, 2003. The partial release signed by Ron Winford of BancorpSouth shows that Lee's units 305 and 306 were released on May 19, 2004, and his unit 307 was released on June 23, 2004. Thus, whether the ***Pongetti*** rule is triggered depends on whether BancorpSouth had notice that Van Buren had sold units specifically to the purchasers before the partial releases of the Ford and Lee units.

¶40. A letter from Bobby Covington of TCS to Bobby Little of BancorpSouth regarding the Van Buren condos, dated August 23, 2001, states that Covington, who, as an attorney on behalf of Van Buren, was tasked with preparing the Deed of Trust release documents for the bank to review, was holding in his escrow account $21,000 as a deposit of earnest money for Ford's purchase of unit 210. The same letter references the Albritons, Grenfell, and Langston, each of the purchaser group. The fact that only earnest money had been tendered signifies that the units had not yet been conveyed, thus the letter fails to ameliorate the existence of material issues of fact as to the subject of notice.

¶41. A second letter, from Frazier Construction to BancorpSouth, dated July 2002, lists several units next to what appears to be a list of buyers and the contracted price, although there are no labels. The July 2002 letter lists, "102 Shane Langston $241,980 . . . 201 James

21

Grenfell $240,000 . . . 207 Bryan $259,000 . . . 303 John Albritton $241,980." The letter also lists "210 Tim Ford $210,000 . . . 305/306 Lee $400,000." Similar to the August 2001 letter, the July 2002 letter does not state that the units actually had been conveyed to their respective purchasers or even that a contract had been entered.

¶42. An internal BancorpSouth letter from Ron Winford to James Stringer, dated June 2, 2003, and summarizing the discussions of a March 31, 2003, meeting with Frazier, states that "the project is 91% complete and 27 of 30 units [have been] sold." It goes on to say that Winford "anticipate[d] being paid out of this project by the end of August [2003]." The letter then cryptically states that, according to a third-party inspector, "the project has been slow and there has been derogatory information reported on [the inspector's] trade lines. This verifies information that we have received regarding the same." Another internal bank document, dated April 8, 2004, states that "25 of the 30 units have been sold and delivered" and that two of the five remaining had been contracted. Neither of these documents makes reference to specific conveyances to any of the purchasers.

¶43. Viewing the evidence in the light most favorable to BancorpSouth, the Court finds that an issue of material fact exists regarding whether BancorpSouth had actual notice of Van Buren's conveyances to the purchasers when it released Ford's and Lee's units from the deed of trust. Because of the existence of an issue of material fact, we reverse the trial court's grant of summary judgment and remand the case for further proceedings consistent with the instant opinion. We also affirm in part the judgment of the Court of Appeals as to the reversal of the trial court's judgment as to Brantley and Crumpton, but we reverse it in part as to its affirmance of summary judgment as to the four purchasers.

22

## CONCLUSION

¶44. In order for the ***Pongetti*** rule to apply and for BancorpSouth to have to credit the value of the Ford and Lee units against the amount owed before foreclosing on the purchasers' units, BancorpSouth must have had actual notice of the alienation of the purchasers' units when it released the Ford and Lee units. Because an issue of material fact exists as to whether the bank had such actual notice, we reverse the trial court's grant of summary judgment and remand to the trial court for proceedings consistent with this opinion.

¶45. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART. THE JUDGMENT OF THE CHANCERY COURT OF LAFAYETTE COUNTY IS REVERSED AND THE CASE IS REMANDED.**

**WALLER, C.J., DICKINSON, P.J., KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR. RANDOLPH, P.J., AND LAMAR, J., NOT PARTICIPATING.**